No. 2--06--0556          Filed: 10-30-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 05--CF--1719 |
| TOMAS OCAMPO, | ) ) | Honorable George J. Bakalis, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Tomas Ocampo, was charged with possession of a controlled substance with intent to deliver, in connection with an alleged incident in which police observed him enter into a drug transaction and subsequently discovered drugs after searching him. On August 29, 2005, defendant filed a motion to suppress asserting that he had been detained without probable cause, reasonable suspicion, or a warrant and that he had been searched without his consent. The State appeals the judgment of the trial court granting that motion. For the reasons that follow, we affirm.

At the hearing on defendant's motion to suppress, defendant first called Detective Robert Toerte of the Du Page County sheriff's office. Toerte testified that, on the afternoon of June 14, 2005, he was in plain clothes and on duty conducting surveillance on a residence when he went to a nearby gas station to refuel his automobile. He parked his car at the last gas pump on the east side of the gas station, and he saw a car park close to a nearby car wash while its driver talked on a

cellular phone and looked around. The driver eventually moved the vehicle 15 to 30 feet to the east side of the gas station, so that the car was approximately 50 to 60 feet from Toerte's position at the gas pump. Toerte then saw defendant emerge from behind the gas station, "walk[] around the back side of the [car], tap[] on the trunk and [get] in on the passenger's side." Toerte stated that he did not notice if defendant was carrying a cellular phone.

Toerte then "noticed as [defendant] sat down [defendant and the driver] looked at each other and [defendant] sat back in the seat as though he was trying to remove something from his pants." Toerte did not hear either man say anything because the car windows were up, but the two men were "moving as though they were talking." He could not see anything below the two men's upper arms because his view was blocked by the car door, and, accordingly, he did not see the men exchange anything. When defendant got out of the vehicle after "less than two minutes," he did not have anything in his hands. Defendant walked back behind the gas station. Toerte did not know either defendant or the driver of the automobile and did not know of any outstanding arrest warrants for either man.

Toerte contacted the officers who were helping him on surveillance and asked them to come to the gas station because he suspected that he had just witnessed a narcotics transaction. Toerte approached the driver of the automobile and instructed the other officers to approach defendant. From his vantage point, Toerte could not see the other officers confront defendant. The officers later told Toerte that they had discovered illegal narcotics on defendant's person.

On cross-examination, Toerte stated that he was assigned to the undercover narcotics unit at the Du Page County sheriff's office and had been part of "[h]undreds" of undercover drug transactions inside vehicles. He estimated that drug dealers remove narcotics from their pants

pockets approximately "[s]eventy percent of the time." Toerte testified that defendant's leaning back in his seat in the motor vehicle was "the same" as what he had observed in other in-vehicle drug transactions.

Defendant next called Detective Larry Rogers of the Du Page County sheriff's office. He testified that, at approximately 3:45 p.m. on June 14, 2005, after receiving a call from Toerte, he drove to a gas station approximately one-half mile from where he had been parked. As he arrived, Toerte informed him that Toerte suspected that defendant, who was walking away from a car, had taken part in a drug transaction inside the car. Rogers drove his car behind the gas station and parked "about fifty feet ahead of the subject," but he did not position his parked car in such a way that it would have impeded defendant's progress or cut defendant off. Rogers then exited his vehicle and approached defendant. Rogers "had [his] badge out in [his] hand and [he] told [defendant] [he] was a police officer and [he] needed to talk to him." Defendant "started shaking and told [Rogers] he was scared." On cross-examination, Rogers stated that he asked defendant for identification and that defendant produced a Mexican driver's license. Rogers recalled on cross-examination that he identified himself as a police officer in English and that defendant responded in English that he was scared. Rogers stated that defendant never indicated that he did not understand what Rogers was saying during the encounter.

Rogers never frisked defendant or pressed defendant against a wall, and, while he was present, neither he nor any other detectives threatened defendant. He did not advise defendant of his rights, and, though Rogers had a sidearm, it was hidden from defendant's view. Rogers could see no bulges in defendant's pants or shirt upon encountering him, and Rogers knew of no outstanding warrants for defendant's arrest.

After two more detectives arrived to question defendant, Rogers walked away to check with Toerte before returning to defendant and the two detectives. All three were "just standing around," and one of the detectives was holding a bag of white powder, which he told Rogers he recovered from the front of defendant's pants.

Defendant next called Detective Anthony Terranova of the Du Page County sheriff's office. He testified that, at approximately 3:45 p.m. on June 14, 2005, he received a call from Toerte while he was working undercover near the gas station described above. When he arrived at the gas station, he got out of his vehicle and walked toward Toerte, who told him that he believed that two other detectives were with defendant at the back of the gas station. Terranova saw the two detectives standing next to defendant, and, as he approached, Rogers told him that defendant was the suspect whom Rogers had stopped. On cross-examination, Terranova recalled that, when he first approached defendant, defendant was "motioning and holding his shirt area *** where his pants belt buckle would be." Defendant was "just making movements towards that area and holding, just holding, hiding the area." Terranova testified that he believed that defendant was carrying either drugs or a weapon in that area.

After approximately two minutes, and as Rogers stood there, Terranova asked defendant if police could search him, and defendant agreed. On cross-examination, Terranova stated that he asked defendant, and defendant agreed, in both English and Spanish. When another officer, who was wearing a police uniform, searched defendant, a small baggie with four other clear plastic bags, each containing a white powdery substance, fell to the ground. On cross-examination, Terranova agreed that, when he initially approached defendant, the police officers who were with defendant were not threatening or harming defendant in any way.

On redirect examination, Terranova indicated that he did not recall if Rogers was present when Terranova asked for defendant's consent to perform a search.

Defendant next testified on his own behalf. At the outset of his testimony, defendant indicated that he spoke "[a] little bit" of English. (Defendant did not use a translator during his testimony at the hearing.) He testified that, on June 14, 2005, as he was walking behind a gas station, he was encountered by someone who identified himself as a police officer. Three more police officers arrived within a minute. The first officer showed his badge but did not say that he "needed to talk" to defendant. Rather, he asked defendant, "what did you buy and what did you give the other one?" Within two minutes of the first officer showing his badge, defendant was searched without consent, by an officer in plain clothes. On cross-examination, defendant denied that he had been putting his hands by his shirt or belt buckle before the officer searched him. He recalled that the officers spoke to him only in English, despite his telling them that he could not understand them.

After hearing argument from both sides, the trial court stated that it did not think the encounter between police and defendant was consensual, because police asked to talk to defendant and "they made it clear by their display of authority that they needed to talk to him, that he was being stopped for that purpose." The trial court stated that the question became whether police had a reasonable and articulable suspicion to justify the stop, and it held over its ruling on that issue until it was able to review the relevant caselaw. The memorandum opinion the trial court subsequently issued on May 8, 2006, stated as follows, in pertinent part:

"1. Defendant's initial encounter with [Rogers] was a non-consensual encounter. The court held that [Rogers's] display of his badge to the defendant and telling defendant 'we need

to talk' followed by the immediate arrival of three other officers on the scene would have led a reasonable person to conclude that [he was] not free to ignore the officer and walk away.

2. Based on the credibility of the witnesses the court held that after this encounter defendant did consent to the search of his person resulting in the discovery of the drug evidence now sought to be suppressed.

The question to be decided is whether there existed a basis for a <u>Terry</u> stop of the defendant. The court finds the facts to be as follows:

1. Detective Toerpe [<u>sic</u>] was at a gas station purchasing gas.

2. The officer noted a car parked near the station car wash.

3. The officer observed from approximately 50-60 feet away the driver in the car alone on his cell phone, looking around the area.

4. The officer observed defendant walk from behind the station and enter the passenger side of the car.

5. The officer observed defendant lean back in his seat appearing to take something from his pocket but the officer could not see what if anything defendant was actually doing other than leaning back in the seat.

6. The officer observed no exchange of any items and saw no money or other items being exchanged.

7. The defendant exited the car and walked away in a normal manner.

8. The officer instructed his fellow officers to stop the defendant in the back of the gas station.

Detective Toerpe [sic] did not testify to any prior knowledge of the defendant or the driver of the vehicle, nor did he testify that he was familiar with the area as a place for drug transactions. *** The detective testified that he felt based on his training [and] experience that what he had observed in the vehicle was a drug transaction.

* * *

The court finds that these observations are not sufficient to raise a suspicion of criminal activity. Numerous innocent constructions can be given to the activity observed here. ***

Here, even acknowledging the lesser standard of reasonable articuable [sic] suspicion, the court finds that the officer's observations [were] insufficient to warn [sic] a Terry stop. Defendant's motion to suppress is granted."

After the trial court denied the State's motion to reconsider, the State filed a certificate of impairment (see People v. Young, 82 Ill. 2d 234, 247 (1980)) and a timely notice of appeal on June 5, 2006. The lone issue on appeal is whether the trial court erred in granting defendant's motion to suppress.

In considering a challenge to a trial court's ruling on a motion to suppress, a reviewing court will uphold findings of historical fact made by the trial court unless such findings are against the manifest weight of the evidence. People v. Pitman, 211 Ill. 2d 502, 512 (2004). However, a reviewing court remains free to draw its own legal conclusions based on the historical facts, and, accordingly, we review de novo the ultimate question of whether the evidence should have been suppressed based on the facts presented. Pitman, 211 Ill. 2d at 512.

The fourth amendment to the United States Constitution protects the " 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' " Pitman, 211 Ill. 2d at 513, quoting U.S. Const., amend IV. "Similarly, article I, section 6, of the Illinois Constitution provides that the 'people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches [and] seizures.' " Pitman, 211 Ill. 2d at 513, quoting Ill. Const. 1970, art. I, §6.[1]

The State's first argument on appeal is that defendant was not seized at any time before he granted the officers consent to search him, and, therefore, their actions did not implicate defendant's fourth amendment rights. See Pitman, 211 Ill. 2d at 523 ("A well-settled, specific exception to the fourth amendment's warrant requirement is a search conducted pursuant to consent"). "For purposes of the fourth amendment, an individual is 'seized' when an officer ' "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." ' " People v. Gherna, 203 Ill. 2d 165, 177-78 (2003), quoting Florida v. Bostick, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 398, 111 S. Ct. 2382, 2386 (1991), quoting Terry v. Ohio, 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 905 n.16, 88 S. Ct. 1868, 1879 n.16 (1968). "It is well settled that a seizure does not occur simply because a law enforcement officer approaches an individual and puts questions to that person if he or she is willing to listen." Gherna, 203 Ill. 2d at 178. So long as a reasonable innocent person would feel free to disregard the police and go about his or her business, the encounter is consensual and the fourth amendment is not implicated. Gherna, 203 Ill. 2d at 178. "However, when, taking into account ' "all

---

[1]Though Illinois courts deviate in limited circumstances from interpreting article I, section 6, of our constitution in lockstep with the fourth amendment (see People v. Caballes, 221 Ill. 2d 282 (2006)), the present case presents no reason to deviate from lockstep.

the circumstances surrounding the incident" ' [citations], the [police conduct] would lead a reasonable innocent person under identical circumstances to believe that he or she was not 'free to decline the officers' requests or otherwise terminate the encounter' [citation]," the person is considered seized under the fourth amendment. Gherna, 203 Ill. 2d at 178. As the analysis presumes a reasonable innocent person, it hinges on the objective evaluation of the police conduct and not on the subjective perception of the individual approached. Gherna, 203 Ill. 2d at 178.

Our supreme court has adopted the four-factor test articulated in United States v. Mendenhall, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980), for determining whether police activity should be characterized as a seizure. People v. Luedemann, 222 Ill. 2d 530, 555 (2006); see People v. Murray, 137 Ill. 2d 382, 388-91 (1990) (adopting Mendenhall factors). Mendenhall lists four examples of circumstances that may be indicative of a seizure, even where the person did not attempt to leave: (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled. Mendenhall, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877. " 'In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.' " Murray, 137 Ill. 2d at 390-91, abrogated on other grounds by Luedemann, 222 Ill. 2d 530, quoting Mendenhall, 446 U.S. at 555, 64 L. Ed. 2d at 509-10, 100 S. Ct. at 1877).[2]

_____

[2]In its brief, the State notes that there are three levels of police-citizen encounters: arrests, stops, and encounters that involve no coercion or detention. The State then cites Luedemann for the proposition that "[t]he third type of encounters are 'consensual encounters,' and have also been

Regarding the first Mendenhall factor, although there was no evidence that the officers threatened defendant, the testimony was undisputed that several officers confronted defendant before he consented to a search. The State attempts to diminish the importance of the fact that other officers joined Rogers in questioning defendant shortly after Rogers initially confronted him, by noting that "the officers arrived at different times and *** only two or three officers stood near defendant at one time." However, even if the additional officers did not arrive simultaneously and remain with defendant, the record establishes the presence of more than one officer, and at times three officers, during the encounter with defendant.

The State cites People v. Ollie, 333 Ill. App. 3d 971, 982 (2002), for the proposition that a seizure will not always occur even where several officers are present. In Ollie, four officers went to the last known address of a person of interest in a murder investigation and obtained consent to enter the home to find the person of interest. Ollie, 333 Ill. App. 3d at 975. Two of the officers went to the basement, where they encountered three men, including the defendant, and, upon being asked, the three men all agreed to accompany police to the police station to be interviewed. Ollie, 333 Ill. App. 3d at 975-76. The defendant later argued that he had been seized at the time the officers transported him to the station, because he was patted down before being transported, he was not given the option of transporting himself, and up to six officers were present at the scene. Ollie, 333 Ill. App. 3d at 981-82. The appellate court noted that there was "no evidence that the additional

referred to as the 'community caretaking function.' " While Luedemann does state that the third type of encounter has been referred to as "community caretaking" in such cases as Murray, it does so only to explain that the label is incorrect. The State's reference to Luedemann incorrectly implies the opposite.

officers called to the scene had any interaction whatsoever with the defendant" and that no force was used. Ollie, 333 Ill. App. 3d at 982. It therefore held that there had not been a seizure when the defendant was transported. The current case is easily distinguishable on the ground that the additional officers did have interaction with defendant, the only suspect in their immediate area. Further, in Ollie, the presence of many officers was the only one of the Mendenhall factors alleged to be present,[3] while here, defendant alleges the presence of additional factors, which we discuss below.

Likewise, in People v. Hicks, 183 Ill. App. 3d 636 (1989), another case upon which the State relies, the court held that there was no seizure, because "only one officer questioned defendant while another stood nearby, both officers were dressed in plain clothes, neither officer displayed his weapon, neither officer touched the defendant, and neither officer raised his voice or indicated that the defendant had no choice but to comply with them." Hicks, 183 Ill. App. 3d at 643. Here, again, the evidence showed that the additional officers did interact with defendant, and the presence of multiple officers is not the only factor upon which defendant relies in arguing that he was seized. Hicks, then, is also distinguishable from the present case. That said, though the State's cases are distinguishable, we take the State's point to be that the presence of multiple officers does not per se convert an encounter into a seizure. Though we agree with that principle, the presence of the officers here does establish at least one factor indicative of coercion, and we consider it among all the remaining circumstances.

Before moving to the second factor, we note that the State also cites Hicks for the proposition that the officers' being in plain clothes, rather than in police uniforms, was an indicium that the

---

[3]The court in Ollie did not directly refer to the Mendenhall factors.

encounter was not a seizure. The excerpt from <u>Hicks</u> quoted above demonstrates that, indeed, the court considered the fact that the officers were in plain clothes in ruling that no seizure had taken place. Other courts have followed this approach by implying that the fact that police were not in uniform made an encounter less coercive. See <u>People v. Wicks</u>, 236 Ill. App. 3d 97, 105 (1992) ("Defendant was met in the vestibule of his apartment by two plainclothes detectives and not overwhelmed by a number of armed uniformed police officers"); <u>United States v. Nobles</u>, 69 F.3d 172, 181 (7th Cir. 1995) ("A reasonable person, who was engaging in a 'normal' conversation with plainclothed, unarmed officers, in a crowded airport, whose path was not impeded, and who was specifically advised that he was free to leave and not under arrest, would feel that he was free to leave the scene"); <u>People v. Gillam</u>, 479 Mich. 253, 263, 734 N.W.2d 585, 591 (2007) ("Of the three officers at his door, only two were in uniform"). Indeed, at least one federal circuit expressly considers whether police were in uniform as a factor in determining the coerciveness of a police-citizen encounter. See <u>United States v. Zapata</u>, 997 F.2d 751, 756 (10th Cir. 1993). However, though these cases seem to rely at least in part on the idea that police were not wearing police uniforms, the parties have not directed us to any authority discussing the rationale for considering police attire as a relevant factor.

We note that the primary effect of a police uniform is that it identifies its wearer as a police officer, and, in that sense, where an officer in plain clothes shows his or her police badge or otherwise identifies him or herself as a police officer, we do not discern any coercive difference from an officer in uniform, based on attire. However, an officer wearing a police uniform may create an air of formality or may project greater authority than would an officer in plain clothes. Thus, we are not prepared to hold, as a matter of law, that there is no difference between the coercive effect of fully

uniformed police and that of plainclothes police, because police wear uniforms at least partly for the purpose of creating an atmosphere of comfort for the innocent and trepidation for the guilty. In any event, to the extent the officers' attire in this case rendered the encounter with defendant any less coercive, we hold that this was overborne by the officers' other, coercive actions.

The second and third Mendenhall factors were not present during the encounter here, as the testimony indicated that the officers did not display their weapons, and there was no evidence that the officers physically touched defendant before the search. Defendant does not rely on these factors in asserting that he was seized before he consented to the search.

Regarding the last Mendenhall factor, Rogers testified that he told defendant that he "needed to talk" with defendant. The State argues that a person's indicating that he "needs to talk" with someone is "in everyday language *** merely an opening to a conversation," and therefore the State urges that a reasonable person in defendant's position would not have interpreted Rogers's statement as a command. We disagree. First, the word "need" indicates a requirement, and Rogers testified that he informed defendant that he "needed" to talk with him, not that he asked defendant if he could talk with him. Second, and relatedly, Rogers did not testify that he waited for defendant's assent after approaching him indicating a need to talk.

The State emphasizes that there is no evidence that Rogers used a forceful tone of voice when he told defendant that he "needed to talk to him." The record establishes neither that Rogers did or did not use a forceful tone in confronting defendant, and the trial court made no finding on that point.

Therefore, we agree with the State that the coercive nature of the initial encounter with defendant was not increased by the tone of Rogers's voice.[4]

However, we do note that the context of Rogers's introductory comments to defendant increases their coercive nature. Rogers testified that he pulled his car in front of defendant (far enough ahead so as not to directly block defendant's path) behind the gas station, then exited the car, showed his badge, and told defendant they needed to talk. This conduct would convey to a reasonable person in the same position that the approaching police officer had arrived to question him specifically and at that moment. See United States v. Ward, 961 F.2d 1526, 1532 (10th Cir. 1992) ("we believe that a reasonable innocent person who is alone when approached by law enforcement officers is more likely to feel that he or she was the specific object of the officers' inquiry"), overruled on other grounds by United States v. Little, 18 F.3d 1499, 1504 (10th Cir. 1994). Thus, we conclude that the final Mendenhall indicium of coercion was also present in this case.

Though we find two of the Mendenhall factors to indicate a seizure in this case, the State relies on several additional characteristics of the encounter here for its argument that the encounter did not constitute a seizure. The State notes that Rogers was not in uniform, approached defendant in a public area, did not park his car to block defendant's path, and did not inform defendant of his Miranda rights. However, as discussed above, there were also several indicia of a seizure present in this case, including the first and last Mendenhall factors. The State urges that each of the individual

---

[4]Defendant argues that the State has waived any reliance on the tone of Rogers's voice because it failed to elicit any testimony on that point. Because we agree with defendant that he was seized even assuming that Rogers's tone was not forceful, we need not reach this issue.

indicia in this case has been held elsewhere not to amount to a seizure, but our test "focuses on the coercive effect of police conduct taken as a whole, and not on each particular detail of police conduct in isolation." People v. Stofer, 180 Ill. App. 3d 158, 166 (1989). Our review of all the circumstances of this encounter, in their totality, convinces us that a reasonable, innocent person in defendant's position, confronted behind a gas station by an officer, who was soon joined by three other officers, and told that the officer "needed to talk to him" under circumstances that indicated the officer sought him out specifically, would not have felt free to leave. Accordingly, we agree with the trial court that defendant was seized before he gave any consent to search.

The State's second argument on appeal is that, even if defendant was seized at some point before he granted police consent to search him, the seizure did not violate defendant's fourth amendment rights. As noted, the fourth amendment and the Illinois Constitution prohibit searches and seizures only where they are unreasonable. "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." People v. Cox, 202 Ill. 2d 462, 466 (2002). However, under the exception created by the United States Supreme Court in Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), if a police officer "has 'knowledge of sufficient articulable facts at the time of the encounter to create a reasonable suspicion that the person in question has committed, or is about to commit a crime' the officer may briefly stop and detain the person to make reasonable inquiries." People v. Love, 199 Ill. 2d 269, 275 (2002), quoting People v. Smithers, 83 Ill. 2d 430, 434 (1980). Whether a Terry stop is supported by a reasonable suspicion depends on the facts known to the officer at the time of the stop. People v. DiPace, 354 Ill. App. 3d 104, 108 (2004). "While the facts supporting the officer's suspicions need not rise to the level of probable cause, they must be based on more than a mere hunch." Cox, 202 Ill. 2d at 467. For the

reasons below, we conclude that police here lacked a reasonable suspicion of criminal activity at the outset of the stop.

At the time the officers stopped defendant, Toerte had seen the driver of a car talking on his cellular telephone before pulling closer to a gas station and had seen defendant come out from behind the gas station, walk around the vehicle, tap on the trunk, get inside, exchange a look and a short conversation with the driver, and move as if he were taking something out of his pocket. Toerte testified that he could not hear the conversation or see the subjects' hands during the encounter. He did not testify that the area in question was a high-crime area or that police had any incriminating prior knowledge about either subject. The State argues that, given Toerte's testimony that defendant's movements were the same as movements Toerte had seen in previous drug transactions, police had ample cause to stop defendant. We disagree. Though defendant's movements may have been consistent with a drug transaction, they were also consistent with any number of other scenarios. Further, the testimony here did not indicate that police had any reason, independent of defendant's observed actions, to suspect that criminal activity might have occurred. Police here came upon defendant purely by coincidence, not as part of a stakeout of a known drug-trafficking area. In our view, the articulable facts provided by Toerte in this case gave rise only to a hunch, and no more, that defendant was engaged in criminal activity. Defendant's observed actions, even when taken together, are simply far too common, without more, to give rise to a reasonable suspicion versus only a hunch of criminal activity.

The State relies on two cases, In re F.R., 209 Ill. App. 3d 274 (1991) and People v. Morales, 221 Ill. App. 3d 13 (1991), for the proposition that the above facts can support a finding of reasonable suspicion, but both cases actually support our holding that the stop here was improper

from the outset.  In F.R., a police officer testified that he had observed approximately 25 drug transactions at a particular intersection and had made "about a dozen" arrests there in the past six months.  F.R., 209 Ill. App. 3d at 276.  In the officer's experience, these transactions involved a car that would pull up to a corner before the driver would motion to a person standing on the corner, who would approach the car and initiate a drug transaction.  F.R., 209 Ill. App. 3d at 276.  The officer testified that, while he was on duty at the intersection, he saw the respondent walk over to a car after the driver waved to the respondent.  F.R., 209 Ill. App. 3d at 276.  The officer did not see the respondent and the driver exchange anything and did not hear any of their conversation.  F.R., 209 Ill. App. 3d at 276, 280.  The respondent "immediately" moved away from the car upon seeing the uniformed officer and his partner nearby.  F.R., 209 Ill. App. 3d at 276.  The appellate court held that, "[i]n light of the fact that, from [the officer's] experience, he knew drug transactions occurred at this corner with juveniles walking up to parked cars, the events of [F.R.] could lead him to reasonably suspect from all the circumstances that the respondent was committing or was about to commit a crime."  F.R., 209 Ill. App. 3d at 280.  The State contends that here, just as in F.R., police could not see any actual exchange between defendant and the other subject and could hear none of their conversation.  However, the court in F.R. emphasized that the officer in that case knew that many drug transactions had taken place at the particular intersection he was surveilling, in the particular manner in which he saw the respondent behave.  Here, by contrast, there was no evidence either that the area in question was a high-crime area or that defendant's actions were consistent with a particular manner in which drug transactions took place in the area.  In short, the articulable facts that the appellate court relied on most heavily in F.R. are noticeably lacking in this case.

In Morales, a police officer saw, from a distance of approximately 20 feet, the defendant and another man approach each other and appear to exchange something. Morales, 221 Ill. App. 3d at 15. The men's behavior appeared to be a " 'drug type action,' " but the officer did not see any drugs or money during the exchange. Morales, 221 Ill. App. 3d at 15. After the officer shined a spotlight on the two men, they both walked away, and the defendant walked "with his hands in a cupped fashion." Morales, 221 Ill. App. 3d at 15. The officer pulled his car up next to the defendant, again shined the spotlight on him, and asked the defendant what had been exchanged. Morales, 221 Ill. App. 3d at 15. The defendant shrugged his shoulders, but, upon subsequently being asked what was in his hands, he displayed a butane lighter fluid box. Morales, 221 Ill. App. 3d at 15. While the defendant was displaying the box, the officer noticed that the defendant " 'had a bulge in his pocket.' " Morales, 221 Ill. App. 3d at 15. Thinking the bulge to be a firearm, the officer told the defendant to put his hands on the squad car and, upon feeling the bulge and subsequently removing the contents of the defendant's pocket, discovered illegal drugs. Morales, 221 Ill. App. 3d at 15-16. Since both parties on appeal "seem[ed] to assume" that the seizure occurred when the officer exited the squad car and approached the defendant, the appellate court addressed the propriety of the stop at that point in time. Morales, 221 Ill. App. 3d at 17. The court held that the stop was proper, based on the following articulable facts: "defendant was holding his hands in a cupped manner, close to his body; defendant had appeared to exchange something with another man which [the officer] characterized as a 'drug-type action'; and defendant and the other man immediately separated when the officers arrived." Morales, 221 Ill. App. 3d at 17.

The State notes that police in this case, just as in Morales, "saw what appeared to be an exchange between defendant and another individual" and "did not see what was exchanged, but it

looked like a narcotics transaction." We disagree with the State's characterization of the facts of this case. Toerte testified not that he saw an exchange, but that he saw defendant and the driver make movements as if they were making an exchange. In fact, Toerte specifically testified that he could not see the two men's hands and could not see them exchange anything. This fact distinguishes the current case from Morales.

The State also argues that "[w]hereas the police saw the defendant in Morales cupping his hands close to his body after the transaction, Terranova saw defendant using his hands to conceal something in his shirt." However, Terranova saw defendant make these motions after defendant had been seized, not before, as was the case in Morales. Even if defendant's furtive actions were analogous to the defendant's in Morales, those actions could not be used as a basis for a stop that preceded them. Further, in this case, Toerte actually testified that defendant was not carrying anything in his hands upon leaving the vehicle.

Finally, the State notes that defendant here, just like the defendant in Morales, "acted nervously when approached by police." Again, unlike in Morales, the defendant did not act nervously until after he was seized. Also, in Morales, the defendant and his associate appeared to end their encounter to try to evade police, while, here, defendant did not become evasive at the close of the alleged transaction. As the trial court noted in its ruling, defendant "exited the car and walked away in a normal manner." In short, we believe that all of the grounds the State cites to analogize Morales actually serve to distinguish it from the current case.

The critical difference between this case and F.R. is that F.R. involved police observations in a known high-crime area, while the police here came upon defendant purely by coincidence. Outside of their observations of defendant just before his seizure, police had no reason to suspect defendant

of committing a crime. The critical difference between this case and Morales is that the police in Morales observed much more suspicious activity by the defendant than did the police in this case. Without the type of independent suspicion in F.R. or the type of additional suspicious behavior in Morales, the articulable facts known to police in this case were insufficient to establish a reasonable suspicion rather than only a hunch that defendant had committed a crime.

Because we hold that defendant was seized in violation of the fourth amendment, we agree with the trial court's decision to suppress evidence police obtained after searching defendant pursuant to his consent. See People v. Brownlee, 186 Ill. 2d 501, 519 (1999) (subsequent consent to search may be tainted where police exceed Terry).[5] Accordingly, we do not reach the State's arguments regarding whether the officers' actions after the seizure were justified.

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

GROMETER, P.J., and CALLUM, J., concur.

---

[5]The State does not argue that, if defendant was seized without reasonable suspicion, his subsequent consent was not tainted by the illegal seizure.