# Illinois Official Reports

## Appellate Court

---

### *People v. Dailey*, 2018 IL App (1st) 152882

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JULIAN B. DAILEY, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-2882 |
| Filed | September 4, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-5573; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Emily E. Filpi, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Leonore Carlson, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion.<br>Presiding Justice Mason concurred in the judgment and opinion.<br>Justice Walker specially concurred, with opinion. |

**OPINION**

¶ 1    Following a bench trial in Cook County circuit court, defendant Julian B. Dailey was found guilty of possession of a controlled substance and sentenced to 30 months in prison. On appeal, defendant contends that the trial court erred when it denied his motion to quash arrest and suppress evidence because the police lacked "reasonable suspicion and probable cause" to stop defendant's van after witnessing one hand-to-hand transaction. We affirm.

¶ 2    Following his arrest on February 12, 2013, defendant was charged by information with the offense of being an armed habitual criminal, possession of a controlled substance with intent to deliver, unlawful use or possession of a weapon by a felon, and possession of a controlled substance.

¶ 3    Prior to trial, defendant moved to quash his arrest and suppress evidence, alleging, in pertinent part, that police officers lacked probable cause to believe that defendant or anyone else in the vehicle had committed a crime "from within the vehicle." The matter proceeded to a simultaneous hearing on the motion and a bench trial.

¶ 4    Chicago police officer Thomas Carey testified that on February 12, 2013, he and two other officers were driving southbound when he saw a van that was stopped in the middle of the street. Carey watched a "male black citizen" run from the sidewalk to the driver's side window, hand the van's driver currency, and receive "small items" in return. The person who received the items looked in Carey's direction and then fled in one direction, while the van went in the other direction "at kind of a high rate of speed." Carey, who had been a police officer for 20 years, believed that he had observed a narcotics transaction. During his career he had observed several thousand such transactions.

¶ 5    Carey and his partners followed the van and curbed it. The driver, whom Carey identified in court as defendant, then exited the van. Carey had not ordered the driver to exit the vehicle. As defendant walked toward Carey, he stated " 'I ain't got shit.' " The officers exited their vehicle at the same time. As defendant continued to approach the officers, Carey observed a "marble-size object" drop from defendant's right hand and fall to the ground. Carey walked past defendant and picked up the object while another officer detained defendant. He described the object as a plastic bag that had seven smaller Ziploc Baggies containing suspect heroin. This item was subsequently inventoried. After defendant was placed in custody, Carey informed him of the *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). Defendant indicated that he understood his rights and then made a statement.

¶ 6    Defendant stated that his mother had just passed away and that he was trying to make some money to keep his buildings. Defendant further stated that he had "a drug case in the morning" and that his attorney told him to "do anything he could to stay out of trouble." Defendant also stated that he had "a gun by a garage" and asked whether the officers would let him go if he showed them the gun's location. Carey and his partners then followed defendant's directions to a certain backyard. There, defendant indicated that a gun was inside a grill. Carey exited his vehicle, walked over, reached through the fence, and opened a grill. Inside the grill was a loaded .45-caliber gun. Carey handed the gun to one of his partners and went to speak to the homeowner. Carey then took defendant into custody for the handgun. The handgun was subsequently inventoried. During a subsequent conversation, defendant was asked why he had the handgun. He indicated that "the Nashes were mad that he was making money and he was afraid they were going to pop him off."

¶ 7 During cross-examination, Carey testified that he observed a "very quick exchange" of "small items" and could not determine what the items were or their consistency. Although he saw currency being given to the driver of the van, he could not determine the amount. Carey acknowledged that he did not see any movement inside the van; rather, he observed defendant stick an arm out of the van and hand over small items. Carey did not recall speaking to a man named Lee Miller and denied that Miller gave him the handgun at issue. He never saw defendant in possession of a gun.

¶ 8 The parties stipulated that the contents of the bagged items recovered weighed 1.3 grams and contained heroin.

¶ 9 The defense then presented the testimony of Lee Miller, defendant's neighbor. Miller testified that he was sitting on his "buddy's porch," when an officer approached and asked him to drive defendant's van to Miller's house so that it would not be towed. Police officers then followed him to his house. As Miller parked the van, two officers approached him and told him to get out of the van and that defendant wanted to talk to him. Miller then went to speak with defendant, who was handcuffed in the back of a police car. Defendant asked Miller to take care of his van so that it would not be towed, and Miller agreed. A police officer then stated that defendant would be let go if officers could get "a gun off the street." Miller then walked, accompanied by two officers, to his home. There, he retrieved a gun from the attic and gave it to the officers. The gun did not belong to defendant, and defendant did not have access to it.

¶ 10 The trial court then denied defendant's motion to quash arrest as, "[l]ooking at it in its totality," "the circumstance of the officers' encounter with" defendant was not an "offense" to the fourth amendment. The court next stated that it had heard the evidence and found Officer Carey to be "a more credible and compelling witness" than Miller. The court then noted that the case concerned a "very unusual sequence of events" and concluded that it was "not exactly sure what happened with the gun" and "what kind of possession" defendant had. Therefore, the court gave defendant "the benefit of the doubt" with regard to the offense of being an armed habitual criminal, possession of a controlled substance with intent to deliver, and unlawful use or possession of a weapon by a felon. However the court found that the bag of heroin belonged to defendant and, accordingly, found him guilty of possession of a controlled substance.

¶ 11 Defendant filed a motion for a new trial alleging, *inter alia*, that the trial court erred when it denied defendant's motion to quash arrest and suppress evidence. The trial court denied the motion and sentenced defendant to 30 months in prison.

¶ 12 On appeal, defendant contends that the trial court erred when it denied his motion to quash arrest and suppress evidence because Officer Carey lacked reasonable suspicion and probable cause to curb defendant's van. Defendant notes that Carey only saw one hand-to-hand transaction.

¶ 13 The fourth amendment to the United States Constitution provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV. When a police officer stops a vehicle and detains its passengers, a "seizure" within the meaning of the fourth amendment has occurred. *People v. Timmsen*, 2016 IL 118181, ¶ 9. "Therefore, a vehicle stop is subject to the fourth amendment requirement of reasonableness in all the circumstances." *People v. Jones*, 215 Ill. 2d 261, 270 (2005).

¶ 14 We analyze the reasonableness of traffic stops pursuant to the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). Here, the parties agree that defendant was subjected to a *Terry* stop.

"Pursuant to *Terry*, a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to commit, a crime." *Timmsen*, 2016 IL 118181, ¶ 9. In order to justify a stop, "the officer must point to specific, articulable facts which, when considered with natural inferences, make the intrusion reasonable." *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 23.

¶ 15    Under this reasonable suspicion standard, the facts necessary to justify a *Terry* stop do not need to rise to the level of probable cause and can be satisfied even if no violation of the law is observed, but the facts must go beyond a mere hunch. *People v. Maxey*, 2011 IL App (1st) 100011, ¶ 46. A police officer's decision to conduct a *Terry* stop is a practical one based on the totality of the circumstances. *In re Elijah W.*, 2017 IL App (1st) 162648, ¶ 36. A reviewing court applies an objective standard when deciding "whether the facts available to the officer at the time of the incident would lead an individual of reasonable caution to believe that the action was appropriate." *People v. Colyar*, 2013 IL 111835, ¶ 40.

¶ 16    In reviewing a trial court's ruling on a motion to quash arrest and suppress evidence, this court applies a two-part standard of review. *People v. Grant*, 2013 IL 112734, ¶ 12. We accord great deference to the trial court's factual findings and will reverse them only if they are against the manifest weight of the evidence; however, we review the trial court's ultimate ruling on the motion *de novo*. *Id.*

¶ 17    Here, given the totality of the circumstances, the decision to stop the van that defendant was driving was proper under *Terry*. Carey, a police officer who had observed several thousand narcotics transactions during his 20-year career, testified that he observed a man run up to a van stopped in the middle of the street and exchange currency for "small items," then run away. Based upon these actions, Carey believed that he had observed a narcotics transaction, and officers then proceeded to follow and curb the van, which had driven away at a high rate of speed. See *People v. Lomax*, 2012 IL App (1st) 103016, ¶ 40 (noting that police officers are often required to make "split-second decisions, without the benefit of immediate hindsight" in tense and rapidly evolving situations). Moreover, once defendant's vehicle was curbed, defendant exited on his own accord without being instructed to do so by officers and then proceeded to drop a small object to the ground as he walked toward officers.

¶ 18    Although defendant is correct that Carey admitted that he could not determine exactly what the "small items" were, there is no requirement that Carey know that the items were definitely contraband or that he assign an innocent explanation to the exchange. See, *e.g.*, *People v. Love*, 199 Ill. 2d 269, 277 (2002) (concluding that innocent explanations for the defendant's pulling an item from her mouth and giving it to a man in exchange for money were "implausible," when "common sense dictates that the man probably did not go out at 1:50 a.m. in late January for prechewed gum"). Rather, the question is whether the facts "available" to Carey at the time would "lead an individual of reasonable caution to believe" that the stop was appropriate. See *Colyar*, 2013 IL 111835, ¶ 40.

¶ 19    In the case at bar, there were "specific, articulable facts" upon which Carey relied to justify stopping defendant, that is, a van was stopped in the middle of the road, an exchange of money for small items took place, and the parties involved immediately went their separate ways. See *Simpson*, 2015 IL App (1st) 130303, ¶ 23 (although "the facts forming the basis of reasonable suspicion" do not require an officer to actually observe a crime, the determination of reasonable suspicion must be based on commonsense judgments about human behavior). We

therefore conclude that the trial court properly denied defendant's motion to quash arrest and suppress statements.

¶ 20 We are unpersuaded by defendant's reliance on *People v. Ocampo*, 377 Ill. App. 3d 150 (2007). In that case, an officer testified that a person was in a parked car at a gas station talking on a cell phone. The defendant walked up to the car, tapped on the trunk, and got in the front passenger seat. The driver and the passenger exchanged a look and had a short conversation, and the defendant moved as if he were taking something out of his pants pocket. The officer could not hear the conversation and did not see the defendant's hands. On appeal, the court found that those facts provided the officer with only a hunch of criminal activity, when although the defendant's actions were consistent with a drug transaction, they were also consistent with other innocent scenarios. *Id.* at 162. The court also noted that the testimony did not indicate that the police had any reason, other than the defendant's actions, to suspect criminal activity. *Id.* Rather, the police observed the defendant "purely by coincidence, not as part of a stakeout of a known drug-trafficking area." *Id.*

¶ 21 In the case at bar, defendant's van was not parked; rather, it was stopped in the middle of the street. Moreover, unlike *Ocampo*, where the defendant got into a car and then proceeded to have a conversation with another person, here, a man ran up to the van, exchanged money for small objects, and then immediately ran away. Additionally, unlike *Ocampo*, Carey actually observed the exchange.

¶ 22 We are similarly unpersuaded by defendant's reliance on *People v. Petty*, 2012 IL App (2d) 110974. In that case, police officers observed as two cars parked at a gas station, and the drivers of both cars then exited their vehicles, engaged in a hand-to-hand transaction of "some unknown object or objects," and got back into their vehicles. *Id.* ¶ 3. Officers then stopped the defendant's vehicle, and cannabis was recovered. The trial court denied the defendant's motion to suppress, finding that officers believed that they had witnessed a drug transaction. On appeal, the court relied on *Ocampo* to reverse, determining that the defendant's conduct was consistent with "any number of innocent scenarios," that the officers happened upon the defendant by coincidence, and that, other than the observed actions, the officers had no reason to suspect that criminal activity had occurred. *Id.* ¶ 17.

¶ 23 *Petty* is distinguishable on the basis that in the instant case Carey testified that he observed the hand-to-hand transaction and the fact that defendant's van was parked in the middle of the street rather than in a parking spot. Moreover, after the exchange, both parties rapidly left the area, that is, the man fled on foot, and defendant drove away "at kind of a high rate of speed."

¶ 24 Here, given the totality of the circumstances, Carey relied upon "specific, articulable facts" (*Simpson*, 2015 IL App (1st) 130303, ¶ 23) as justification for the stop of the van. Considering the facts available to Carey at the time, we conclude that "an individual of reasonable caution" would believe that Carey's action was appropriate (*Colyar*, 2013 IL 111835, ¶ 40) and, accordingly, the trial court properly denied defendant's motion to quash arrest and suppress evidence.

¶ 25 Having determined the officers had reasonable suspicion to conduct a *Terry* stop of defendant, we need not address his argument that the evidence obtained should be suppressed as the fruit of an unlawful stop.

¶ 26 Finally, this court has identified a troubling delay in this case.

¶ 27      This is a relatively simple case, and the chronology of events demonstrates the problems this court and defendant face in dealing with appeals in a timely manner:

| | |
|---|---|
| Aug. 25, 2015: | Finding of guilty, sentenced to 30 months in prison |
| Aug. 31, 2015: | Notice of appeal (NOA) filed with clerk of the circuit court |
| Sept. 11, 2015: | Clerk of the circuit court transmitted the NOA to the clerk of the appellate court; State Appellate Defender (SAD) appointed to represent defendant |
| Oct. 2, 2015: | SAD notified of appointment |
| Oct. 15, 2015: | NOA filed by clerk of the appellate court |
| Nov. 12, 2015: | SAD motion to extend time to file the record to Jan. 4, 2016, granted; SAD has not yet received transcript; court reporter generally takes 7 months to get the transcript done |
| Nov. 18, 2015: | SAD ordered report of proceedings |
| Dec. 9, 2015: | Docketing statement filed |
| Jan. 6, 2016: | SAD motion to extend time to file the record to Feb. 19, 2016; SAD has not yet received transcript; SAD expects it will be six more months before it receives the transcript; SAD expects the clerk of the circuit court will need two weeks to prepare the record |
| Jan. 14, 2016: | SAD received record from clerk of the circuit court |
| Mar. 1, 2016: | SAD motion to extend time to file record to May 2, 2016; SAD expects it will take four more months to get the transcript |
| Apr. 5, 2016: | Certificate in lieu of record filed |
| May 10, 2016: | SAD motion to extend time to file brief to July 12, 2016, granted; SAD very busy and expects 10 months before it gets to this case |
| July 13, 2016: | SAD motion to extend time to file brief to Sept. 13, 2016, granted; SAD very busy and expects nine months before it gets to this case |
| Sept. 12, 2016: | SAD motion to extend time to file brief to Nov. 15, 2016, granted (marked final); SAD very busy; expects seven months before it gets to this case |
| Apr. 10, 2017: | Record filed |
| July 6, 2017: | SAD motion to file brief *instanter* granted |
| Aug. 8, 2017: | State's Attorney's office (SAO) motion to extend time to file brief to Oct. 10, 2017; SAO very busy (one full month after SAD filed its brief) |
| Oct. 12, 2017: | SAO motion to extend time to file brief to Dec. 11, 2017, granted; SAO very busy |
| Nov. 16, 2017: | SAD motion to supplement record with stipulation and certified copies of convictions granted |
| Dec. 13, 2017: | SAO motion to extend time to file brief to Feb. 12, 2018 granted; SAO very busy |

| | |
|---|---|
| Mar. 30, 2018: | SAO motion to file brief *instanter* granted; SAO very busy |
| Apr. 2, 2018: | SAD notified clerk of the appellate court of defendant's civilian address; defendant no longer in prison |
| Apr. 9, 2018: | SAD reply brief filed |
| Apr. 17, 2018: | SAD motion to supplement record granted |
| Apr. 17, 2018: | Original transcript, one volume, filed with clerk of the appellate court |

¶ 28      We specifically add this chronology to illustrate the inordinate delay in addressing the merits of this appeal. On August 25, 2015, the trial court sentenced Julian Dailey to 30 months in prison on his possession of narcotics conviction, and his notice of appeal was filed on August 31, 2015. With credit for time served in pretrial custody (he was arrested on August 8, 2014), Dailey was eligible for release less than one year later on August 8, 2016. Dailey was subject to a one-year period of mandatory supervised release (MSR), which expired on August 8, 2017.

¶ 29      The certificate in lieu of the record was not filed until April 5, 2016, more than seven months after the trial court entered judgment and four months before Dailey's scheduled parole date. His opening brief on appeal was not filed until more than a year later, on July 6, 2017, or 11 months after Dailey's release from prison and one month before the expiration of his MSR term.

¶ 30      His reply brief was not filed until April 9, 2018, long after he had fully served his sentence. By the time this case was ready for this court to consider, there was no meaningful relief we could have provided had there been any merit in the issue Dailey raised on appeal.

¶ 31      This is not justice.

¶ 32      This case demonstrates the complete breakdown of justice caused in part by inefficiencies and in larger part by the failure of elected executive officials to assure that the State Appellate Defender, the State's Attorney, the clerk of the court, and the court reporter's office have the resources they need to prepare criminal cases quickly and effectively.

¶ 33      The clerk of the circuit court did not transmit the record to the State Appellate Defender until January 14, 2016, even though it was requested November 11, 2015. The State Appellate Defender ordered the transcript November 18, 2015, and the court reporter did not provide it—one volume—until sometime around May 10, 2016.[1]

¶ 34      The State Appellate Defender cannot begin working on briefs until it has the common-law record and transcripts. The State's Attorney cannot begin working on briefs until it sees the brief filed by the State Appellate Defender and the record. Neither party can begin to do anything until the clerk of the court prepares the common-law record and the court reporter prepares the transcript.

¶ 35      And this court cannot do anything with the case until it is ready, that is, until the complete record, both briefs, and the reply brief are filed here. The defendant's Notice of Appeal was filed with the clerk of the circuit court on August 31, 2015. The certificate in lieu of the record

---

[1]This situation is expected to improve for new cases under the e-filing mandates as the court reporters' use of digital equipment comes into use, but that will not help with hard-copy cases that are still in the pipeline.

was filed here on April 5, 2016, and the record on appeal was not transmitted to this court until April 10, 2017.

¶ 36    In this case we have specifically called attention to the State Appellate Defender's motions to extend time to file the record because it did not have the transcripts: November 12, 2015 (expect transcript to take seven months); January 6, 2016 (expect transcript to take about six months); March 1, 2016 (expect the transcripts to take another four months).

¶ 37    Then the State Appellate Defender filed four motions to extend time because the office was handling too many cases with too few attorneys: May 10, 2016; July 13, 2016; September 12, 2016, and then finally July 6, 2017, the brief was filed *instanter*. If the State Appellate Defender got the transcripts around May 10, 2016, which is when it filed its first motion to extend time to file the briefs (so, it must have had the transcripts), then it took 14 months for the State Appellate Defender to prepare the brief.

¶ 38    The State's Attorney filed four motions to extend time because that office was also handling too many cases with too few attorneys: August 8, 2017; October 12, 2017; and December 13, 2017, and then finally the State's Attorney filed its brief on March 30, 2018, *instanter*. It took the State's Attorney the better part of nine months to file its brief.

¶ 39    Under Illinois Supreme Court Rule 326 (eff. July 1, 2017), the record on appeal is due 63 days after the filing of the notice of appeal. Dailey's record was due November 3, 2015; the State Appellate Defender received the common-law record from the clerk of the circuit court on January 14, 2016, fully 2½ months after it was due.

¶ 40    This case demonstrates perfectly the slippery slope we see all too often. Once it became acceptable for every deadline to slide, the avalanche of missed dates was inevitable at every level. And, this case is actually on the low end of the typical delays we see in criminal cases. On average, it takes about one year for the clerk of the circuit court to transmit the record in criminal cases to our court. We have seen in this case how a huge part of the problem is the length of time it takes to get the transcripts from the court reporter.

¶ 41    We respectfully suggest that the Governor review the budget of the State Appellate Defender to assure that it is staffed appropriately. E-filing of documents will speed up the process of receiving the "paperwork," but it cannot, without sufficient staff, speed up the process of reviewing cases for appealable issues, drafting and preparing motions and orders, and preparing for and handling oral argument.

¶ 42    We ask the state budgeteers to assure that the court reporter's office has the resources necessary to transmit transcripts efficiently.

¶ 43    In addition, we ask the president of the county board and the board to take notice that, even with paperwork available through e-filing, there still needs to be sufficient personnel to read the material and write the motions and briefs and prepare for and handle oral argument. The State's Attorney's office is clearly stretched, resulting in situations like this one.

¶ 44    We suggest the State Appellate Defender review assignment protocols, where defendants with short sentences might be considered out of order.

¶ 45    Let us reiterate the core principle of our democracy: that justice requires a speedy resolution. Delaying appeals causes hardship on the defendant and his family; burdens the appellate court with the unenviable task of deciding cases after the defendant has served his time; may impact unnecessarily on the IDOC population headcount, resulting in unnecessary

costs to taxpayers; and, in cases where the appealable issue leads to a reversal or remand, may deny the defendant of his most fundamental protected right: his liberty.

¶ 46 The judgment of the circuit court of Cook County is affirmed.

¶ 47 Affirmed.

¶ 48 JUSTICE WALKER, specially concurring:

¶ 49 I concur in the judgment reached by the majority opinion as well as its reasoning, but I take no part in the discussion in paragraphs 26 to 45. The discussion in those paragraphs is *dicta* and not essential to the disposition of the issues in this case.