2020 IL App (1st) 182100-U

FIFTH DIVISION
DECEMBER 11, 2020

No. 1-18-2100

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 3246 |
| | ) | |
| SAMMY CANO, | ) | Honorable |
| | ) | Diane G. Cannon, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Delort and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The defendant's conviction for predatory criminal sexual assault of a child and sentence of 18 years' imprisonment are affirmed; the trial court did not err in denying the defendant's motion to quash arrest and suppress evidence; and the trial court conducted a proper *Krankel* inquiry.

¶ 2    Following a jury trial in the circuit court of Cook County, the defendant-appellant, Sammy Cano, was convicted of predatory criminal sexual assault of a child and sentenced to 18 years' imprisonment. The defendant now appeals. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 3                                    BACKGROUND

¶ 4       In 2012, the State charged the defendant with predatory criminal sexual assault of a child

and aggravated sexual abuse for an incident that occurred in 2002 with his female cousin, J.G.,

who was six years old at the time. Prior to trial, the defendant filed a motion to quash arrest and

suppress evidence on the basis that the police did not have reasonable suspicion to stop him and

subsequently arrest him.

¶ 5                              Motion to Quash Hearing

¶ 6       At a hearing on the motion, the defendant testified[1] that on January 17, 2012, he went to

Home Depot to buy a sponge. When he exited the store, he saw a group of five or six men standing

outside. He was familiar with the men and knew they were standing outside the store to look for

work. The defendant admitted that he had stood outside Home Depot and approached cars to solicit

work before, but he was not doing so on that day, although he did join the group to chat with the

other men.

¶ 7       The defendant testified that he was preparing to say goodbye to the other men and head to

his job when two police officers approached the group. One of the police officers began speaking

in Spanish and asked for the defendant's identification. According to the defendant, he did not feel

free to leave and he handed over his identification card with his name, Sammy Cano, on it. The

defendant denied providing the police officers with a false name or false date of birth. The police

officers then placed the defendant in handcuffs, searched him, and took him to the police station.

¶ 8       Chicago Police Officer Dennis Conway testified that, on January 17, 2012, he and his

partner traveled to the parking lot of Home Depot to respond to "numerous complaints of loitering"

---

[1]The defendant testified at the motion to quash hearing and at the trial through a Spanish
interpreter.

that had been filed in the previous six months; although there had not been a complaint for anything in particular on that day. The two officers saw the defendant approach several different cars in the Home Depot parking lot. They approached the defendant's group and Officer Conway's partner began speaking to them in Spanish. Officer Conway testified that the purpose of approaching the defendant's group was "[j]ust a general field interview."

¶ 9     Detective Conway's partner asked the defendant for his name and date of birth. Detective Conway testified that the defendant gave them the same name of "Sammy Lopez" twice, as well as two different dates of birth. The police officers ran the name "Sammy Lopez" with both dates of birth through the computer in their police car but "[t]hey didn't come back to any individual." The officers then placed the defendant into custody for obstructing identification. The defendant was subsequently searched and an identification document with the name "Sammy Cano" was recovered from him. The officers ran the name "Sammy Cano," which revealed an active investigative alert. Detective Conway explained that "[a]n investigative alert is an alert issued usually by the detectives when they would like to speak to an individual in regards to a crime."

¶ 10     Chicago Police Detective Manuel De La Torre testified that he interviewed the defendant later that evening after Officer Conway and his partner had brought him to the police station. The defendant then gave an inculpatory statement. Detective Manuel De La Torre testified that the investigative alert for the defendant had been created based on allegations of sexual abuse by the defendant's younger cousin, J.G. He did not know when the investigative alert was submitted and did not testify to the alert's contents.

¶ 11     At the conclusion of the hearing, the defendant argued that the police officers were not investigating a crime when they stopped him and asked his name. He averred that this meant he

had not been legally detained, and in turn, it was not a crime for him to give the police officers a false name. The defendant argued that, consequently, his subsequent arrest for obstructing identification and the inculpatory statement he provided at the police station were improper and should be suppressed.

¶ 12    Before the State could counter, the trial court rejected the defendant's argument. The trial court stated:

> "In this case Officer Conway testified that he saw a crime. The defendant and his friends were soliciting business in the Home Depot parking lot. I believe he saw what he saw. [The defendant] said he was out there with friends who stopped cars and looked for work. Admirable but *** Home Depot did not appreciate it. It is trespassing. It is illegal solicitation of business. [The police officers] had a right, maybe not to throw them all in jail, but to at least approach and say what are you guys doing here and what are your names. [The defendant] gave them two separate names and two separate dates of birth, and they had a right to arrest him.
>
> Thereafter, the investigative alert popped up. They have to follow police procedure and send him on to the detective. Does that mean automatic charges? No. But they passed him on to the detective who issued the investigative alert."

The trial court accordingly denied the defendant's motion to quash arrest and suppress evidence.

¶ 13    The defendant filed a motion to reconsider, which the trial court denied. In so ruling, the trial court stated that, based on the totality of the circumstances, the police officers had a right to approach the defendant and inquire as to what he was doing in the Home Depot parking lot. The trial court further noted that the defendant was only detained very briefly before he gave a false

name, and "the investigation grew from there."

¶ 14                                     Trial

¶ 15    A jury trial commenced. J.G., who was 18 years old at the time of trial, testified. She testified that in 2002, she was six years old and lived in an apartment with her family. Her older cousin, Dany, lived in the same building with her three children, including her oldest daughter, G.G., who was four years old at the time. J.G. went to Dany's apartment five days a week, before and after school, while her mother was working. The defendant is Dany's brother, and he also spent time at Dany's apartment in 2002. The defendant was 28 years old at the time.

¶ 16    J.G. testified that one day in 2002, she was in the living room of Dany's apartment. The defendant and two of Dany's children were also there, but J.G. could not remember if Dany was home at the time. The defendant called J.G. and G.G. into the bedroom that was just off the living room. Once the two girls were inside the bedroom, the defendant closed the door and took them behind a bunk bed. He made J.G. lay down on the floor and he pulled down her underwear. He then "used his tongue to lick between [her] lips of [her] vagina" for a couple of minutes. She felt uncomfortable and tried to pull away from the defendant. Afterwards, she did not tell anyone about the incident because she felt scared and thought she had done something wrong.

¶ 17    Two years later, in 2004, J.G. was eight years old and told her teacher what had happened with the defendant. The school called J.G.'s mother, who picked up J.G. and brought her home. There, J.G. told her mother that the defendant had touched her vagina with his fingers. She told her mother that he had used his fingers and not his tongue because she was "still uncomfortable" and was scared that she did something wrong. She testified at trial that the defendant never touched her vagina with his fingers, only his tongue. After she told her mother about the incident, they

notified the police and she never saw the defendant again.

¶ 18    In January 2012, J.G. was sixteen years old and was notified by detectives to come speak with them at the Chicago Children's Advocacy Center (CAC). She spoke with a detective and an assistant state's attorney and told them that the defendant used his tongue to touch her vagina in 2002. J.G. testified that she felt "more comfortable" telling them the truth about what happened because she was older and "understood what really happened."

¶ 19    On cross-examination, J.G. testified that she could not remember if Dany ever left her and the other children alone with the defendant. When the defendant brought her and G.G. into the bedroom and touched her vagina with his tongue, she could not remember if the defendant also interacted with G.G. in any way. She recalled speaking with an investigator from the Department of Children and Family Services (DCFS) in 2004 and telling him that the defendant had also touched G.G. at the same time. J.G. further stated that, in 2004, she told her mother that the defendant had threatened her but then told the DCFS investigator that the defendant did not threaten her.

¶ 20    Gloria G., J.G.'s mother, testified that in 2004, she received a call from the social worker at J.G.'s school. Gloria picked up J.G., who was eight years old at the time, and brought her home. At home, J.G. told Gloria that the defendant had touched her "pee-pee," which Gloria understood to mean her vagina. J.G. told Gloria that the incident had occurred when she was six years old in the bedroom at Dany's apartment while Dany and her children were home. Gloria asked J.G. why she never said anything before, and J.G. told her that the defendant had threatened to harm Gloria if she told anyone. Gloria then took J.G. to DCFS where she was examined by a doctor. On cross-examination, Gloria testified that J.G. also told her that the defendant "had done something

similar" to G.G.

¶ 21    Julia Camacho Monzon testified that she works for DCFS, specifically at the CAC. In April 2004, she was a child abuse investigator and was assigned to J.G.'s case. J.G. was interviewed by Emily Nunez, a forensic interviewer. Ms. Camacho Monzon observed the interview behind a one-way glass wall, along with Assistant State's Attorney Alvin Renteria and Detective Margaret Engstrom.

¶ 22    At the beginning of the interview, Ms. Nunez conducted a test to ensure that J.G. was able to understand the difference between a truth and a lie. Ms. Camacho Monzon testified that, during the interview, J.G. told Ms. Nunez that the defendant had "touched her on her private part." J.G. told Ms. Nunez that the defendant had called her and G.G. into the bedroom and J.G. thought he was going to give them money. But instead, the defendant closed the bedroom door, took J.G. behind the bed, and touched "her front part with his hands and nails." Ms. Camacho Monzon stated:

> "[Ms. Nunez] asked [J.G.] what part was that and she kind of pointed to it and she asked her what the name was and she said a name but I can't remember it right now but she asked her, well, what do you use that part for and she said I used that part to pee."

J.G. told Ms. Nunez that she was screaming for the defendant to stop while he was touching her. She also said he did the same thing to G.G. When Ms. Nunez asked J.G. if she had told anyone else about the incident, J.G. said that the defendant told her she could not tell anyone, and that "she was afraid because he was a big man and she was also afraid about her mom getting mad." Ms. Camacho Monzon subsequently attempted to locate the defendant to interview him but was unable

to find him.

¶ 23    Sergeant Margaret Engstrom testified that, in 2004, she was working as a detective in the special investigation unit for sex crimes involving children at the CAC. Following J.G.'s interview with Ms. Nunez, Sergeant Engstrom searched for the defendant. She looked for him at three or four known addresses, but was never able to locate him. Sergeant Engstrom did make contact with his sister, Dany, though, in April 2004. Dany told Sergeant Engstrom that she had not seen the defendant since November 2003 and did not give her any other information. Sergeant Engstrom then entered an investigative alert for the defendant.

¶ 24    Chicago Police Officer Rogelio Ocon testified that he was working on January 12, 2017, with his partner, Officer Conway. At approximately 10:45 a.m., they drove to the Home Depot parking lot and saw the defendant. Officer Ocon testified that he stopped the defendant for a field interview and asked him for his identification. Officer Ocon asked the defendant his name and date of birth, to which he provided "Sammy Lopez" with a date of birth of September 4, 1974. Officer Ocon explained: "We have a computer that we have access to in the car. We ran the name, and nothing came back." They again asked the defendant for his name and date of birth, and the defendant again gave the name Sammy Lopez but with a date of birth of September 5, 1974. Officer Ocon then placed the defendant in custody and ran the name with the second date of birth. Nothing came back. After the defendant was in custody, the police officers found an identification document on the defendant which stated that his name is Sammy Cano with a date of birth of September 5, 1973. They ran that information in their system and learned that the defendant had an investigative alert. They then took the defendant to the police station and notified the detective associated with the investigative alert.

Detective De La Torre testified that he is assigned to the special investigations unit which investigates criminal sexual abuse of children. On January 17, 2012, he was assigned to an investigative alert regarding the defendant. That evening, after the defendant was brought into the police station, Detective De La Torre mirandized and interviewed him with another detective present. Detective De La Torre told the defendant that they were investigating some allegations against him. The defendant responded that he was aware of the allegations through a family member. Detective De La Torre testified that he mentioned J.G.'s name but did not give the defendant any specifics of the allegations. In response, the defendant said that about ten years prior, he regularly visited his sister's apartment and would play with her children, along with J.G. The defendant continued talking. Detective De La Torre testified: "He said that at one point, he was playing with [J.G.], that he took her clothes off, and that he placed his tongue in between her vagina lips and kissed it."

¶ 25    On cross-examination, Detective De La Torre testified that his interview with the defendant was not recorded and the defendant did not give a handwritten statement. Detective De La Torre further testified that the defendant did not tell him that J.G. screamed when he touched her and did not state that he threatened J.G. or her mother. The defendant did not tell Detective De La Torre that he used his fingers or fingernails to touch J.G. The defendant also said that Dany and G.G. were present in the apartment at the time.

¶ 26    The State rested. The defendant moved for a directed verdict, which the trial court denied.

¶ 27    G.G. testified on behalf of the defendant. She stated that she was 16 years old at the time of trial and that the defendant is her uncle. G.G. recalled that when she was around four and five years old, J.G. would come over to her house often and play with her and her siblings. Whenever

J.G. came over, G.G.'s mother, Dany, would watch them. G.G. had no recollection of ever being left alone with the defendant. She further had no recollection of the defendant ever touching her "private parts." When asked if she had any recollection of J.G. telling her that the defendant had touched her private parts, G.G. responded, "No." She also never saw the defendant touch J.G. and never heard J.G. scream because the defendant was touching her.

¶ 28    Dany Cano, the defendant's sister, testified next. In 2002, she babysat J.G. after school. The defendant sometimes visited them, but Dany never left J.G. or any of her children alone with the defendant. She testified that the bedroom was right off the living room, and if someone had been screaming in the bedroom, she would have heard it from the living room.

¶ 29    The defendant testified in his defense. He testified that at the time of trial, he was 39 years old, had been married for six years, and had two young children. He denied ever touching J.G.'s vagina with his tongue, fingers, or fingernails. He denied ever touching J.G. in any way that she did not want him to. On cross-examination, the defendant denied telling Detective De La Torre that he had put his tongue on J.G.'s vagina. He further testified that in 2002, he was never alone with J.G.

¶ 30    At the conclusion of the trial, the jury found the defendant guilty of predatory criminal sexual assault of a child and aggravated sexual abuse. The trial court subsequently merged the aggravated sexual abuse count into the predatory criminal sexual assault of a child count.

¶ 31                                   Posttrial Motion

¶ 32    Following the guilty verdict, the defendant filed a *pro se* posttrial motion alleging, *inter alia*, that he received ineffective assistance of counsel. The trial court asked the defendant to expound on his claim of ineffective assistance of counsel, and the following exchange ensued:

"THE DEFENDANT: He was not -- he was not pending. He didn't defend me the way he should have.

THE COURT: How so, sir?

THE DEFENDANT: In regards to the police officer, the officer said that I had said some things to him; that I was only supposed to say yes and no without going into any details of other things where I could say and explain things that were in my favor, too.

THE COURT: You had an opportunity to testify, sir. I questioned you at length as to whether or not you wanted to testify. You indicated you did not. Oh, you did testify. You had a right to testify and you did testify.

In terms of what the officers had to say, the officers were cross examined as to their testimony, vigorous cross examination of all the witnesses by your attorney. He is not responsible for the words that come out of the witnesses' mouth. Any impeachment or, you know, possible mistakes were brought out by your attorney."

The defendant's trial counsel, who was privately retained, then moved to withdraw from the case and have a public defender appointed. The trial court denied counsel's motion to withdraw, noting that he had been on the case for years and that the defendant's issue was with what Detective De La Torre had said during his testimony. The defendant's trial counsel nonetheless insisted that the defendant have an opportunity to explore his ineffective assistance of counsel claim with new counsel. The trial court responded: "He can always explore your ineffectiveness to a higher court. If someone doesn't like the way the jury returns a verdict, it doesn't go away. The verdict was

based on the law and evidence." The trial court concluded:

> "Every right of the defendant has been protected through representation by able-bodied attorneys for over a year, over the years. Just because he didn't like *** the answers a police officer gave at his trial are not a basis not only for new trial but for you to attempt to leave prior to sentencing and argue the motion that you have prepared."

¶ 33                                     Sentencing

¶ 34    The case proceeded to the sentencing hearing. The State introduced a victim impact statement from J.G., which read, in part:

> "[T]his whole case has changed my life. *** I did not grow up as a normal child like others did like those girls who had sleepovers and were able to go to their friends' house. I never had that because my parents were so afraid that something would happen to me. I just thought that this never would have happened to me.
>
> I always say things happen for a reason and it [*sic*] they do, but I will never wish this on my worst enemy. I had to carry this with me for 12 years. The flashbacks of what happened will never go away. I will have to carry that with me for the rest of my life."

The State requested a harsh sentence based on the psychological impact on J.G., the seriousness of the offense, and the possibility of recidivism.

¶ 35    In mitigation, the defendant argued that for the past decade, he had been living a productive life and had "zero contact with law enforcement." He introduced letters from his wife, mother, and sister describing the defendant as an active father who supported his household. He also introduced

letters from his friends in Alcoholics Anonymous noting that the defendant had become a sober and productive member of society.

¶ 36    In sentencing the defendant, the trial court stated it believed that the defendant did want to change his ways, but that "the court [was] left with a hard, cold fact that [he] committed a sexual act upon [his] six-year-old [relative], someone who she trusted." The trial court then said, "for the protection of society," it was sentencing the defendant to 18 years' imprisonment. This appeal followed.

¶ 37                                    ANALYSIS

¶ 38    We first consider whether we have jurisdiction to hear this appeal. The trial court sentenced the defendant on October 4, 2013. At that time, the defendant indicated his desire to appeal and the trial court appointed the Office of the State Appellate Defender to represent him on appeal. However, the defendant's trial counsel never filed a notice of appeal. On September 20, 2017, the defendant filed a *pro se* postconviction petition alleging that his trial counsel was ineffective for failing to perfect his appeal. That petition advanced to the second stage of postconviction proceedings, where, on May 21, 2018, the parties agreed that trial counsel was ineffective for failing to perfect the direct appeal. The trial court accordingly granted the defendant leave to file a late notice of appeal from the October 4, 2013, judgment. Therefore, we have jurisdiction to consider the merits of this appeal. See *People v. Ross*, 229 Ill. 2d 255, 322 (2008) (when a postconviction petitioner demonstrates that counsel was ineffective for failing to file a notice of appeal, the trial court may allow the petitioner leave to file a late notice of appeal).

¶ 39    The defendant presents the following issues on appeal: (1) whether the State proved the defendant guilty beyond a reasonable doubt of predatory criminal sexual assault of a child; (2)

whether the trial court erred in denying the defendant's motion to quash arrest and suppress evidence; (3) whether the trial court conducted a proper *Krankel* inquiry; and (4) whether the defendant's sentence of 18 years' imprisonment is excessive. We take each issue in turn.

¶ 40    The defendant first argues that the State failed to prove him guilty of predatory criminal sexual assault of a child. Specifically, he claims that the evidence was insufficient to convict him where J.G. originally said that the defendant touched her vagina with his *fingers* but later said that he touched her vagina with his *tongue*. The defendant points to other inconsistencies in J.G.'s statements, such as whether Dany was in the apartment at the time, whether the defendant also touched G.G., and whether the defendant threatened J.G. He further stresses that J.G.'s testimony is contradicted by G.G.'s testimony and is not supported by any physical evidence. The defendant also claims that Detective De La Torre's testimony about the defendant's inculpatory statement is incredible because he did not record his interview with the defendant.

¶ 41    The State has the burden of proving beyond a reasonable doubt each element of an offense. *People v. Gray*, 2017 IL 120958, ¶ 35. When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* In doing so, "a court of review will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Id.*

¶ 42    The operative offense is predatory criminal sexual assault of a child (720 ILCS 5/12–

14.1(a)(1) (2002)). To sustain a conviction for predatory criminal sexual assault of a child, the State must establish, beyond a reasonable doubt that the defendant, who was 17 years of age or older, committed an act of sexual penetration upon the victim, who was younger than 13 years old at the time the act was committed. *Id.* "Sexual penetration" means "any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth, or anus of another person." 720 ILCS 5/12–12(f) (2002).

¶ 43    It is undisputed that, in 2002, the defendant was over 17 years old and J.G. was under 13 years old. However, the defendant contends that the State failed to establish that sexual penetration occurred because of the discrepancies in J.G.'s statements regarding whether he touched her vagina with his fingers or his tongue. Yet, J.G. was unequivocal in her testimony at trial that the defendant touched her vagina with his tongue, and the unequivocal testimony of a single witness is sufficient to convict. *People v. Wells*, 2019 IL App (1st) 163247, ¶ 23. The fact that J.G. initially stated that the defendant touched her vagina with his fingers instead of his tongue does not take away from her testimony as a whole. As this court has previously said:

> " '[A] complainant's testimony need not be unimpeached, uncontradicted, crystal clear, or perfect in order to sustain a conviction for sexual abuse. [Citations.] Where minor inconsistencies or discrepancies exist in a complainant's testimony but do not detract from the reasonableness of her story as a whole, the complainant's testimony may be found to be adequate to support a conviction for sexual abuse. [Citations.]' " *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 84 (quoting *People v. Soler*, 228 Ill. App. 3d 183, 200 (1992)).

¶ 44    Further, J.G.'s testimony was corroborated by Detective De La Torre's testimony that the

defendant told him that he touched J.G.'s vagina with his tongue. The defendant takes issue with the fact that Detective De La Torre did not record the defendant's statement. Importantly, the defendant does not challenge the *admissibility* of Detective De La Torre's testimony; he merely argues that his testimony is incredible. But it is the responsibility of the trier of fact to determine the witnesses' credibility and the weight to be given to their testimony. *People v. Green*, 2017 IL App (1st) 152513, ¶ 102. The jury in this case found J.G.'s testimony credible notwithstanding the discrepancies in her statements. They also found Detective De La Torre's testimony credible notwithstanding the fact that he did not record the defendant's statement. The jury clearly gave Detective De La Torre's and J.G.'s testimony more weight than the defendant's and G.G.'s testimony. We find no reason to disturb that determination. See *id.* (on the issue of credibility, a reviewing court will not substitute its judgment for that of a jury).

¶ 45    Contrary to the defendant's argument, it is irrelevant that J.G.'s testimony is not supported by any physical evidence. See *People v. Morgan*, 149 Ill. App. 3d 733, 738 (1986) (it is not necessary that corroborating medical evidence be admitted to prove that penetration did occur). Accordingly, viewing the evidence in the light most favorable to the State, we find that the State proved the defendant guilty beyond a reasonable doubt, of predatory criminal sexual assault of a child and we affirm his conviction for that offense.

¶ 46    The defendant next argues that the trial court should have granted his motion to quash arrest and suppress evidence because his seizure by the police officers was unconstitutional. He claims that the police officers saw him and his friends just standing in the parking lot of the Home Depot store and approaching cars, which was an insufficient reason to stop and detain him. He further claims that even if he gave the police a false name and date of birth, that was not a crime because

he was not lawfully detained at the time. The defendant accordingly argues that the subsequent statement he gave to Detective De La Torre was "the fruit of [his] unconstitutional arrest" and should have been suppressed.

¶ 47     In reviewing a trial court's ruling on a motion to quash arrest and suppress evidence, this court applies a two-part standard of review. *People v. Dailey*, 2018 IL App (1st) 152882, ¶ 16. "We accord great deference to the trial court's factual findings and will reverse them only if they are against the manifest weight of the evidence; however, we review the trial court's ultimate ruling on the motion *de novo*." *Id.*

¶ 48     The defendant's motion to quash arrest and suppress evidence argued that the police did not have enough reasonable suspicion to stop him and subsequently arrest him. The United States Constitution and the Illinois Constitution protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. "[T]he touchstone of the fourth amendment is reasonableness, which is measured objectively by examining the totality of the circumstances surrounding a police officer's encounter with a citizen." *People v. Lake*, 2015 IL App (4th) 130072, ¶ 28. It is well settled that not every encounter between the police and a private citizen results in a seizure. *Id.* ¶ 35. Encounters between police and citizens are divided into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, commonly referred to as "*Terry* stops," which must be supported by reasonable, articulable suspicion of criminal activity; and (3) consensual encounters, which involve no coercion or detention and thus do not implicate the fourth amendment. *Id.* Pursuant to a *Terry* stop, "a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to, commit a crime." *People v. Timmsen*, 2016 IL

118181, ¶ 9. "Reasonable, articulable suspicion" is a less demanding standard than probable cause, but an officer's suspicion must still amount to more than just a "hunch" of criminal activity. *Id.* When this court evaluates the validity of a *Terry* stop, we consider the totality of the circumstances surrounding the stop. *Id.*

¶ 49 During the hearing on the defendant's motion, Officer Conway testified that he and his partner, Officer Ocon, went to the parking lot of the Home Depot store because of "numerous complaints of loitering" that had been filed with the police in the previous six months. Upon their arrival, they saw the defendant standing in the parking lot and approaching various cars. The defendant himself testified that the group of men he was standing with were soliciting work in the parking lot. Looking at the *totality of the circumstances*, the police officers had reasonable, articulable suspicion that the defendant was engaging in criminal activity, specifically trespassing and/or soliciting unlawful business. In turn, it was reasonable for the police officers to briefly stop the defendant and ask him some preliminary questions.

¶ 50 Because the defendant was then lawfully detained pursuant to a *Terry* stop, it was illegal for him to provide a false name and a false date of birth. See 720 ILCS 5/31-4.5(a)(2) (West 2012) ("A person commits the offense of obstructing identification when he or she intentionally or knowingly furnishes a false or fictitious name, residence address, or date of birth to a peace officer who has *** lawfully detained the person"). So once the defendant provided the police officers with a false name and a false date of birth, the police officers had enough probable cause to arrest the defendant for obstructing identification. *People v. Grant*, 2013 IL 112734, ¶ 11 ("Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime."). The

defendant's proper arrest ultimately led the police officers to discover the defendant's investigative alert and bring him to the police station to meet with Detective De La Torre, where he gave an inculpatory statement. Consequently, there was no justification for suppressing the defendant's statement to Detective De La Torre. We therefore hold that the trial court did not err in denying the defendant's motion to quash arrest and suppress evidence.

¶ 51    Next, the defendant argues that the trial court should have provided him with new counsel to assess his *pro se* posttrial claim of ineffective assistance of counsel. He argues that the trial court did not conduct a proper *Krankel* inquiry regarding his ineffective assistance claims, but instead merely asked "just a few cursory questions." The defendant avers: "Had the court conducted [a proper *Krankel*] inquiry, it would have learned that new counsel was needed to independently assess and present [the defendant's] ineffectiveness claims." He asks us to remand the case back to the trial court with instructions to appoint new counsel to assess his ineffective assistance claims.

¶ 52    A *pro se* posttrial claim alleging ineffective assistance of counsel is governed by the common law procedure developed by our supreme court in *People v. Krankel*, 102 Ill. 2d 181 (1984). See *People v. Jolly*, 2014 IL 117142, ¶ 29. The trial court is not required to automatically appoint new counsel when a defendant raises an ineffective assistance of counsel claim. *People v. Lawson*, 2019 IL App (4th) 180452, ¶ 40. Instead, when a defendant brings a *pro se* posttrial petition claiming that trial counsel was ineffective, the trial court must conduct some type of inquiry, known as a *Krankel* inquiry, into the underlying factual basis of the defendant's claim of ineffectiveness. *People v. Ayres*, 2017 IL 120071, ¶ 11. If, based on the *Krankel* inquiry, the trial court determines that the defendant's claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel. *Id.* However, if the defendant's allegations show

possible neglect of the defendant's case, then the trial court should appoint new counsel to argue the defendant's claim. *People v. Boose*, 2014 IL App (2d) 130810, ¶ 27. We review *de novo* whether the trial court properly conducted a preliminary *Krankel* inquiry. *People v. Jackson*, 2016 IL App (1st) 133741, ¶ 68.

¶ 53 The record in this case reflects that the trial court carefully considered the defendant's allegations. When the defendant alleged that he received ineffective assistance of counsel because his trial counsel "didn't defend [him] the way he should have," the trial court asked the defendant to expound on that allegation in more detail. And when it became clear that the defendant's issue with his defense counsel, revolved around the fact that he did not like what Detective De La Torre testified to, the trial court responded by noting that trial counsel had conducted a vigorous cross examination of Detective De La Torre and that his trial counsel is "not responsible for the words that come out of the witnesses' mouth." Once the trial court determined that Detective De La Torres' testimony was the main issue in the defendant's claim of ineffective assistance of counsel, this was a sufficient inquiry to determine that the defendant's allegations were unfounded. See *People v. Moore*, 207 Ill. 2d 68, 78 (2003) (a brief discussion between the trial court and the defendant may be sufficient for a *Krankel* inquiry).

¶ 54 The trial court consequently found the defendant's claims to be baseless and determined that new counsel was not needed to assess them. This was a proper determination based on the totality of the circumstances. Simply because the defendant did not like the outcome of the trial does not mean that he received ineffective assistance of counsel. We accordingly reject the defendant's argument that the trial court did not conduct a proper *Krankel* inquiry.

¶ 55 Finally, the defendant argues that his sentence of 18 years' imprisonment is excessive.

Specifically, he claims that a sentence that is "three times the minimum term" is excessive where, in the decade since the incident with J.G., he did not commit other crimes and he established himself as a productive member of society. He asks us to reduce his sentence.

¶ 56    We afford great deference to the trial court's sentencing decision, as the court is in the best position to weigh the relevant sentencing factors which include the defendant's demeanor, criminal history, and social environment, as well as the nature and circumstances of the crime. *People v. Wyma*, 2020 IL App (1st) 170786, ¶ 93. A sentence that falls within statutory guidelines is presumptively proper and will not be disturbed absent an abuse of discretion. *People v. Bridges*, 2020 IL App (1st) 170129, ¶ 37.  An abuse of discretion occurs where the sentence is "at variance with the purpose and spirit of the law or manifestly disproportionate to the nature of the offense." *People v. Himber*, 2020 IL App (1st) 162182, ¶ 59.

¶ 57    The sentencing range for the crime for which the defendant was convicted was 6 to 30 years. Thus, his sentence of 18 years falls squarely within that range and is therefore presumed to be proper. Notwithstanding, the record shows that the trial court carefully considered all the mitigating factors and noted that the defendant did want to change for the better. The record also shows, however, that the trial court gave greater weight to the seriousness of the crime, which is the most important factor. *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 12 (the seriousness of the crime is the most important factor in determining an appropriate sentence). The trial court's sentence is appropriate in light of the heinous nature of this offense, especially considering J.G.'s victim impact statement in which she described that her life has changed forever because of what the defendant did to her. The defendant's preference for a lighter sentence is not a reason to reduce his sentence. We accordingly affirm the defendant's sentence of 18 years' imprisonment.

¶ 58                                       CONCLUSION

¶ 59     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 60     Affirmed.