2021 IL App (1st) 181351-U

FIFTH DIVISION
MARCH 31, 2021

No. 1-18-1351

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 8101 03 |
| | ) | |
| AKEEM SIMMONS, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Delort and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court did not err in denying the defendant's motion to quash arrest and suppress evidence; any error by the trial court in denying the defendant's motion to suppress statement was harmless; and the trial court did not impose an excessive sentence.

¶ 2   Following a jury trial in the circuit court of Cook County, the defendant-appellant, Akeem Simmons, was convicted of first degree murder and sentenced to 65 years in prison. The defendant now appeals and raises numerous allegations of error by the trial court. For the reasons that follow, we affirm the judgment of the circuit court of Cook County.

¶ 3                              BACKGROUND

¶ 4    The defendant was charged with the October 12, 2012, murder of William Thomas. The defendant was twenty years old at the time of the murder. His three co-defendants, Aramis McKinzie, Garlin Minor, and Malcolm Terry, were also charged with first degree murder. The State's case theorized that the defendant and his co-defendants were part of a group who accidentally shot Mr. Thomas during a gang-related conflict. The defendant was tried in separate but simultaneous jury trials with co-defendant Terry. Prior to the trial, the defendant filed two pre-trial motions: a motion to quash arrest and suppress evidence and a motion to suppress statement.

¶ 5                         Motion to Quash Hearing

¶ 6    A hearing commenced on the defendant's motion to quash his arrest and suppress evidence, which was held simultaneously with hearings on similar motions from co-defendants McKinzie and Minor. Chicago Police Officer Martin Teresi testified that on February 28, 2013, around 2:45 a.m., he went on an assignment with three partners to arrest the defendant at his home in connection with the murder of Mr. Thomas. They did not have an arrest warrant for the defendant or a search warrant for the home. Following the defendant's arrest, the police officers took him to the police station.

¶ 7    Chicago Police Officer Kevin Kilroy testified that he was on assignment with Officer Teresi when they went to arrest the defendant. He testified that detectives had identified the defendant as the shooter in the October 12, 2012, murder of Mr. Thomas based on "interviews with other individuals" at the police station. When police officers knocked on the door of the defendant's apartment, his mother answered. The defendant was in the living room and Officer

Kilroy did not see him doing anything illegal.[1]

¶ 8    After the defendant presented his motion, the State filed a motion for a directed finding and the parties made arguments. The defendant argued that his arrest was unreasonable because the arresting officers did not have a warrant and did not have probable cause to arrest him since he was simply sitting in his living room. Therefore, he claimed that the trial court should quash his arrest and suppress his statement which he made later at the police station. In response, the State argued:

> "When [co-defendants McKinzie and Minor] got to the station, they implicated themselves and they implicated [the defendant] in the homicide. [The defendant] is under arrest because he was implicated by both Mr. McKinzie and Mr. Minor, so they went to arrest him. They don't have to get an arrest warrant. He's been implicated in a homicide. That's probable cause."

¶ 9    The trial court agreed with the State, stating:

> "[The police officers] did have probable cause. I'm aware of the statements made by [co-defendants] McKinzie and Minor through other motions that were filed in the court and there was some brief testimony that this occurred after they implicated or at least they were questioned by the detectives. But the implication is clear. [Co-defendants] McKinzie and Minor implicated [the defendant] and that was probable cause to arrest him."

The trial court then granted the State's motion for a directed finding, and consequently, denied the

---

[1]Officers Teresi and Kilroy also testified, regarding co-defendants McKinzie's and Minor's cases, that prior to the defendant's arrest, they were picked up and questioned at the police station, where they subsequently made incriminating statements.

defendant's motion to quash arrest and suppress evidence.

¶ 10                              Motion to Suppress Hearing

¶ 11    A hearing then commenced on the defendant's motion to suppress his statement. In his motion, the defendant asserted that, following his arrest, he was interrogated by detectives at the police station. During his interrogation, he told the detectives numerous times that he did not want to speak with them; but the detectives ignored his requests and the defendant eventually gave incriminating statements. At the hearing, the defendant introduced and played several clips from his electronically recorded interview (ERI) at the police station with Detectives Garza, Hinkley, Wright, and Murphy. A transcript of the ERI was also submitted into evidence. The ERI began with the detectives giving the defendant his *Miranda* rights and the defendant waiving those rights. The detectives then brought up the October 12, 2012, shooting of Mr. Thomas and told the defendant that other people had identified him as the shooter. The defendant said he heard of the shooting because it was in his neighborhood, but he denied any involvement in it.

¶ 12    The relevant portions of the ERI are as follows:[2]

> "[DETECTIVE]: That's why we're giving you an opportunity --
>
> [THE DEFENDANT]: (Inaudible).
>
> [DETECTIVE]: -- to tell the truth, to tell you[r] side.
>
> [THE DEFENDANT]: I understand but, sir, I just don't want to say anything and get anybody else in trouble and get myself in any more trouble than what I already am.

---

[2]The record reflects that four different detectives interrogated the defendant over the course of the ERI: Detectives Garza, Hinkley, Wright, and Murphy. The transcript does not identify which detective is speaking at which time.

[DETECTIVE]: Well --

[THE DEFENDANT]: I don't know anything about none of this. That's why I'm you (inaudible).

[DETECTIVE]: Let me ask you this. You're - you're - you're - that's hood over there.

[THE DEFENDANT]: Right. I grew up around there."

¶ 13    The detectives continued to tell the defendant that other people identified him as the shooter, but the defendant maintained he was not involved in the shooting and that he had an alibi:

"[THE DEFENDANT]: I wasn't there. How could you force me to say I was at a place where I never was there? You cannot - you can't force me. I just want - I don't want (inaudible).

[DETECTIVE]: Where was this at?

[THE DEFENDANT]: I don't even want to talk to ya'll [*sic*] anymore. I couldn't talk - you go talk to somebody else that could talk funny because I feel like right now me talkin' to ya'll [*sic*] is not getting me nowhere (inaudible).

[DETECTIVE]: Look, it's not - it's not - well you can talk to (inaudible).

[THE DEFENDANT]: 'Cause it feel - I feel like you're trying to pressure me to say something that --

[DETECTIVE]: No, no, no.

[THE DEFENDANT]: -- I didn't do.

[DETECTIVE]: Okay.

[THE DEFENDANT]: That's what I feel like."

¶ 14   Eventually, the defendant admitted to being part of a gang known as the "Hood Gang." He also admitted to knowing that his fellow gang member, Marshawn, had been beaten by a rival gang the day of the shooting. The defendant explained that Marshawn came over to his house and told him about the beating right after it happened. Marshawn then called someone else on the telephone and the defendant overheard him say that he wanted revenge and that there was going to be a fight. Marshawn then left the defendant's house to meet with another gang member, known as Two Feet. The detectives accused the defendant of not only being involved in the shooting, but also of being the actual shooter. The defendant continued to claim that he was not involved with the shooting and that he had an alibi.

"[DETECTIVE]: Okay, what will be your story then when you break the alibi?

[THE DEFENDANT]: What you - what you mean?

[DETECTIVE]: What are you gonna tell us when we ask you, okay hey listen --

[THE DEFENDANT]: I'm gonna talk to my lawyer then. I mean - whatever.

[DETECTIVE]: You want to talk to your lawyer?

[DETECTIVE]: You wanna - is that what you're saying?

[THE DEFENDANT]: I'm saying if you break -

[DETECTIVE]: You got to answer our que - you - you understand what - what we just asked you? Is that what you want?

[DETECTIVE]: If you want your lawyer, then we can't talk.

[DETECTIVE]: We're - we're not talking anymore.

[DETECTIVE]: Is that what you want?

[THE DEFENDANT]: You can talk to me,

[DETECTIVE]: We're talkin', so you - I'm gonna be perfectly clear. You're - you're okay talkin' to us?

[THE DEFENDANT]: Yes, sir.

[DETECTIVE]: You don't want a lawyer right now?

[THE DEFENDANT]: No, sir."

The detectives continued to tell the defendant that his fellow gang members already told them that he was the shooter:

"[DETECTIVE]: Well we can't - I mean we've explained ourselves three or four times and this is it, man. This is it.

[THE DEFENDANT]: Right, so that's what I'm sayin' I'm - that's what I was telling you. I'd rather not even talk with you. You say it's no[ ] doubt --

[DETECTIVE]: So --

[THE DEFENDANT]: -- whether I did it or if I didn't do it.

[DETECTIVE]: So you --

[THE DEFENDANT]: There's not a doubt in it so --

[DETECTIVE]: So you're saying that you don't want to talk about what you're feeling inside now at the time? You don't want to talk about that?

[THE DEFENDANT]: I'm just saying period.

[DETECTIVE]: At all, nothing?

[THE DEFENDANT]: (Inaudible) I don't have nothing' to talk about but I told you everything that I know. I told you I knew there was a fight with the [rival gang]."

¶ 15     Eventually the defendant admitted to knowing more details about the shooting although he was not the shooter:

"[DETECTIVE]: Then who's the f*ckin' shooter, man.

[THE DEFENDANT]: Honestly I could tell you but I really feel like I shouldn't tell you because I feel like I'll be diggin' a deeper hole for myself since I'm already getting' charged with this anyway.

* * *

[DETECTIVE]: Who killed the man?

* * *

[THE DEFENDANT]: And I could tell you - I probably could suption [*sic*] up why they sayin' I'm the shooter anyway because I - I really stopped hanging out with them.

* * *

[THE DEFENDANT]: Yeah, I wanna see my girl then I wanna talk to my mother. I just want to let them know what I'm getting' - what I got myself into, you know 'cause I - I know I got myself into some stuff --

[DETECTIVE]: All right.

[THE DEFENDANT]: -- just dealing with these guys, you know. But in all honesty I ain't pull that trigger."

¶ 16 The defendant then abandoned his alibi and admitted to the detectives that his group went to fight with the rival gang because they had beaten Marshawn that day. He claimed that he hung back across the street while Marshawn and Two Feet crossed the street, and Marshawn fired the gun which unintentionally hit and killed Mr. Thomas.

¶ 17 The detectives asked the defendant whose idea it was to go over and fight with the rival gang and where the gun came from:

"[THE DEFENDANT]: I (inaudible) like really talk no more about it, you know. Just to be safe on my behalf you know 'cause I feel like I'm getting' myself in trouble (inaudible).

[DETECTIVE]: No I - I just wanna - I just want know - you're hear [*sic*] already, you're hear [*sic*] already. They're - we're gonna go get - what's his name again?

[DETECTIVE]: Marshawn.

[DETECTIVE]: Marshawn. What if Marshawn says, all right yeah I got the man - I shot and - but these guys were over here. You walked across the street with them or whatever - whatever he says. Do you understand that - that --

[THE DEFENDANT]: But who - I just want to know who told you that I walked across the street?

[DETECTIVE]: Everybody that was there.

* * *

[THE DEFENDANT]: Can we just leave it as it is already? Can we just - 'cause I know I'm goin' to the county anyway. I already know I'm goin' so I'll just

fight a case.

[DETECTIVE]: Well you wanna be - you wanna be looked at as the shooter, that's with me. You want everybody [to] believe that you did the shooting, that's fine with me.

[THE DEFENDANT]: But I told you already.

* * *

[DETECTIVE]: Tell us the truth. What the f*ck happened? Who walked down there? You or Two Feet walk down there, man?

[THE DEFENDANT]: No.

[DETECTIVE]: Who walked down there?

[THE DEFENDANT]: I don't know, it - I don't know it was dark. I don't know. I just want - I don't wanna talk no more, sir.

[DETECTIVE]: All right, we'll leave it at that. You could leave it in the hand - we'll do the lineups. You know I - I - I don't know what else I could tell you man. I mean I've been honest with you, I've been straight forward. I'm not gonna keep playin' this game. I stood in here longer than I wanted to and I mean you're still bullshittin'. You don't wanna tell us who you were down there with. We'll leave it --

[THE DEFENDANT]: (Inaudible).

[DETECTIVE]: We'll - we'll leave it at - we'll leave it at that. You said you were - like I said you changed your story a bunch of times, dude.

[THE DEFENDANT]: I never went across."

¶ 18   The defendant reiterated that his group went to fight with the rival gang after they had beaten Marshawn, and that his group accidentally shot Mr. Thomas. They ran away afterwards. The defendant said that Two Feet, not he, shot the gun. The ERI concluded shortly afterwards.

¶ 19   After he finished playing the clips from the ERI for the trial court, the defendant argued that his repeated requests to cut off questioning were not scrupulously honored by the detectives, and that the detectives psychologically coerced him into making an incriminating statement. He therefore claimed that his statement should be suppressed. The State argued that the defendant never invoked his right to remain silent because he kept reinitiating the conversation.

¶ 20   Following arguments, the trial court denied the defendant's motion to suppress his statement. In so ruling, the trial court addressed each of the clips played by the defendant and found that there was never an unequivocal invocation by the defendant of the right to remain silent. Instead, the trial court found that the defendant's statements, viewed in context of the entire interrogation, showed the defendant expressing frustration, and also attempting to elicit information from the detectives, or was "part of a long running continuing narrative in which he continue[d] to engage in a dialogue with the detectives." The trial court also pointed out that the defendant asked the detectives questions throughout the interrogation which showed his willingness to engage with them. The trial court found that the defendant's statement was not coerced.

¶ 21                                    Trial

¶ 22   The defendant's jury trial commenced, and the following pertinent evidence was presented. The State's opening statement averred that, on October 12, 2012, Mr. Thomas was an innocent bystander who was inadvertently shot as he was sitting outdoors in a communal area with

neighbors. The State argued that Mr. Thomas was shot by the defendant and his group when they went to fight a rival gang. According to the State, the defendant's group's plan to fight changed as they approached the rival gang's territory, supposedly to avenge the beating of Marshawn Gunn, one of the defendant's fellow gang members. The defendant's group of five young men had a gun and they divided into a shooting team and a lookout team. While the lookouts stayed behind to keep watch, the shooting team crossed the street and shot into a crowd of people, killing Mr. Thomas. The State alleged that the defendant was part of the shooting team.[3] In his opening statement, the defendant argued that he was not a part of the shooting team as he was unaware that there would be a shooting; he claimed to have followed the group believing they were just going to fight.

¶ 23    Theresa Randle testified that, on October 12, 2012, she walked to a store near 68th Street and Stony Island Avenue. When she exited the store, she saw five men walking across the street; one of whom she recognized from her neighborhood. Some of the men broke off from the group and continued walking down 68th Street toward East End Avenue, while the others remained behind and near an alley. Ms. Randle saw the two groups of men make hand gestures to each other. She then heard several gun shots. The group that had walked away suddenly ran back toward the alley where the other men and Ms. Randle were standing. Once the entire group of five men were together again, they all ran away in the opposite direction. Ms. Randle continued walking in the direction of East End Avenue, the direction from which the group of men had come. She saw an "old man laying on the ground." Ms. Randle spoke with police at the scene and again later that same day when a detective came to her home. She subsequently identified co-defendant Terry

---

[3]The State referenced which men were on "the shooting team" but never identified a shooter.

from a photo array as one of the men who stayed back.

¶ 24    Sergeant David Hickey testified that he and Detective Garza interviewed the defendant at the police station from February 28 to March 1, 2013. Detective Garza read the defendant his *Miranda* rights, which the defendant waived, and the defendant's ERI began. Clips from the ERI were played, which were mostly the same clips from the motion to suppress hearing described above in which the defendant indicated that he was part of the group that shot Mr. Thomas after a rival gang had beaten Marshawn.[4]

¶ 25     Marshawn Gunn testified that he was involved in a fight where he suffered injuries, although he did not know who the other people were or the exact date it occurred. After the fight, he went to the defendant's house. He cleaned himself up at the defendant's house and then went home. He denied taking part in the shooting that occurred later that night.

¶ 26    After the State rested, the defendant filed a motion for a directed verdict, which was denied. The defendant also renewed his motion to quash arrest and suppress evidence and the trial court denied that as well. The defense then rested without presenting any evidence.

¶ 27    Following closing arguments and deliberations, the jury found the defendant guilty of first degree murder and found that he or someone for whom he was legally responsible was armed with a firearm.

¶ 28                                    Posttrial Motion

¶ 29    The defendant filed an amended motion for a new trial. The motion argued, *inter alia*, that the trial court erred when it denied the defendant's motion to quash arrest and suppress evidence and when it denied the defendant's motion to suppress his statement. Regarding the motion to

---

[4]Some of the ERI clips were played during the subsequent testimony of Chicago Police Detective Kristi Battalini.

quash arrest and suppress evidence, the defendant's motion claimed that the trial court relied upon his co-defendants' statements to the police as evidence of probable cause.

¶ 30   The trial court addressed the defendant's argument:

"The key testimony, there was numerous references to [co-defendants] Minor and McKinzie implicating themselves and also [the defendant] as the shooter before [the defendant]'s arrest hours later. Most notable was Officer Kilroy's testimony * * * that the defendant had been implicated as the shooter by co[-]defendants Minor and McKinzie before they went to arrest [the defendant]. So there's an abundance of probable cause at that point and I will stand on that ruling."

The trial court rejected the remaining arguments in the defendant's amended motion for a new trial and accordingly denied it.

¶ 31                                  Sentencing

¶ 32   During the sentencing hearing, the defendant's presentence investigation report (PSI) was presented. The PSI indicated that the defendant was born in 1993 and that he was raised by his mother along with his twin brother and younger sister. The defendant had a close relationship with his mother and siblings, although his mother has a history of substance abuse and his brother was deceased. He grew up in a "high crime" neighborhood and joined a gang at the age of 10 "for support." The PSI further provided that the defendant was expelled from his high school in the 9th grade after he was caught selling marijuana. He subsequently attended an alternative high school until his arrest in a juvenile case.

¶ 33   In aggravation, the State presented the testimony of five Cook County Department of Corrections officers. The testimony of the officers, supported by videotaped footage, showed that

the defendant had been in physical altercations at the jail on several different dates; including numerous instances where the defendant punched officers and two incidents in which he exposed his penis to officers.

¶ 34    Sergeant Robert Garza testified that he was the detective assigned to the investigation of Mr. Thomas' homicide. He interviewed co-defendant McKinzie, who implicated the defendant as the shooter in the murder.

¶ 35    Mr. Thomas' daughter read a victim impact statement. She stated that, as a Christian, she had to learn to forgive the defendant but that he still "must pay for [his] actions to the fullest degree given by the law."

¶ 36    In mitigation, the defendant's aunt testified that the defendant always helped her and other family members in the past. She described him as a "very nice kid" whom she loved.

¶ 37    The State noted that the conviction for first degree murder, with the possession of a firearm addition, created a sentencing range for the defendant of 35 to 75 years. The State requested the trial court to sentence the defendant to the maximum of 75 years, arguing that a "significant sentence" was warranted, especially considering the defendant's violent behavior in jail.

¶ 38    The defendant argued that his mother is a "crack addict" and that he "never really had a dad." He stressed that his twin brother was murdered when they were 14 years old and that he took care of his younger sister. He asked the trial court to consider how helpful he is to his family. He apologized to his family members who were present in court and claimed that he had grown while awaiting trial. He also apologized to the family of Mr. Thomas, stating that he was not in the "right state of mind" and noted his gang involvement as a problem. Additionally, he indicated that during some of his physical altercations in the jail, the correctional officers were the aggressors.

¶ 39    The trial court stated that it had reviewed the defendant's PSI and considered all the aggravating and mitigating factors. The trial court further stated: "The facts in this case were absolutely senseless, tragic, and needless as a crime of violence," and emphasized that Mr. Thomas, an innocent person, was killed while sitting outside with his neighbors and enjoying a warm fall evening. The trial court also found that the video footage that showed the defendant "violently attacking correctional officers" was indicative of his "violent, very violent nature." The court told the defendant:

> "Maybe there is some good in you. If that's the case, you will have plenty of time in prison to maybe talk to younger men about the stupidity of being involved in gangs and where it leads you, which is typically where you are going or it leads to the morgue. That's where gang involvement typically takes people."

The trial court found the defendant to be a serious danger to the people of Chicago, and ultimately sentenced him to 65 years in prison.

¶ 40    The defendant's motion to reconsider sentence was denied. This appeal followed.

¶ 41                                    ANALYSIS

¶ 42    We note that we have jurisdiction to consider this matter, as the defendant filed a timely notice of appeal. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 43    The defendant presents the following issues on appeal: (1) whether the trial court erred in denying his motion to quash arrest and suppress evidence; (2) whether the trial court erred in denying his motion to suppress his statement; and (3) whether his sentence of 65 years is excessive. We take each issue in turn.

¶ 44    The defendant first argues that the trial court erred when it denied his motion to quash

arrest and suppress evidence. He claims that the police officers lacked probable cause to arrest him because none of them had first-hand knowledge of the basis for the arrest. He emphasizes that the police officers relied upon "assertions" by the detectives, but the State did not present any of the detectives as witnesses during the hearing. The defendant further avers that the trial court, in denying his motion, considered his co-defendants' incriminating statements related to their own pre-trial motions, which was improper since their cases were severed from his. He thus argues that the trial court should have quashed his arrest and suppressed his subsequent incriminating statement.

¶ 45    In reviewing a trial court's ruling on a motion to quash arrest and suppress evidence, this court applies a two-part standard of review. *People v. Dailey*, 2018 IL App (1st) 152882, ¶ 16. "We accord great deference to the trial court's factual findings and will reverse them only if they are against the manifest weight of the evidence; however, we review the trial court's ultimate ruling on the motion *de novo*." *Id.*

¶ 46    The defendant's motion to quash arrest and suppress evidence argued that there was no probable cause to justify his warrantless arrest. An arrest executed without a warrant is valid only if supported by probable cause. *People v. Grant*, 2013 IL 112734, ¶ 11. "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *Id.* The existence of probable cause depends upon the totality of the circumstances and commonsense considerations. *Id.*

¶ 47    The defendant makes much of the fact that, in denying his motion, the trial court referenced his co-defendants' incriminating statements and avers that the trial court improperly considered information from the other cases even though those cases were severed from his. However, Officer

Kilroy specifically testified as to why the police arrested the defendant. According to Officer Kilroy, they arrested the defendant, based on information from his co-defendants, that the defendant was the shooter. Although the trial court initially mentioned statements that the defendant's co-defendants made "through other motions," the court later clarified that it found probable cause based on Officer Kilroy's testimony that the defendant's co-defendants had implicated him as the shooter.

¶ 48    Indeed, Officer Kilroy testified that the detectives who were investigating the murder, told him that it was the defendant who shot Mr. Thomas. He explained that the information was based on "interviews with other individuals" at the police station. The trial court found that information was sufficient to establish probable cause to justify arresting the defendant without a warrant. Those facts are such that they would lead a reasonably prudent person to conclude that the defendant had committed a crime. Further, it is irrelevant that the State did not call the detectives to testify, because when police officers are working together in investigating a crime, the knowledge of each individual member of the team constitutes *the knowledge of the entire team*, and probable cause can be established from all the information *collectively* received. *In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 111. Thus, we reject the defendant's argument that the police lacked probable cause to arrest him and therefore find that the trial court did not err in denying the defendant's motion to quash arrest and suppress evidence.

¶ 49    Next, the defendant argues that the trial court erred in denying his motion to suppress his statement. He claims that several times during his ERI, he invoked his right to remain silent. He points to the same clips played during the hearing on his motion and argues that the detectives did

not scrupulously honor his requests to stop talking.[5]

¶ 50    "An appeal from a trial court's ruling on a motion to suppress presents mixed questions of fact and law." *People v. Boswell*, 2014 IL App (1st) 122275, ¶ 20. This court accords great deference to the trial court's factual and credibility determinations and will disturb them only if they are against the manifest weight of the evidence. *Id.* However, we review *de novo* the ultimate legal question posed by the trial court's ruling. *Id.* In our review, we may consider testimony presented at trial, as well as that provided at the suppression hearing. *People v. Petty*, 2017 IL App (1st) 150641, ¶ 21.

¶ 51    When a defendant challenges the admissibility of his confession through a motion to suppress, the State has the burden of proving by a preponderance of the evidence that the confession was voluntary. *People v. Braggs*, 209 Ill. 2d 492, 505 (2003). "The concept of voluntariness includes proof that the defendant made a knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel." *Id.* To protect an individual's right not to be a witness against himself, found in both the United States and Illinois Constitutions (see U.S. Const. amend. V; Ill. Cont. 1970 art. I, § 10), interrogation must cease once the individual indicates, at any time, that he wishes to remain silent. *People v. Hernandez*, 362 Ill. App. 3d 779, 785 (2005).

¶ 52    Importantly, an invocation of the right to remain silent must be *unambiguous*, *unequivocal*, and *clear*. *People v. Kronenberger*, 2014 IL App (1st) 110231, ¶ 33. After reviewing the transcript from the defendant's ERI, we agree with the trial court that most of the defendant's statements, which he claims were an invocation of his right to remain silent, were equivocal. While the

---

[5]Although the defendant also argued, during the hearing on his motion, that his confession was coerced by the detectives, he does not raise that argument on appeal.

defendant points to isolated statements such as, "I just don't want to say anything," and "I don't even want to talk to ya'll [*sic*] anymore," these statements are not unequivocal invocations of his right to remain silent when viewed in the entire context of the conversation and exchange during which they were said. See *id* ¶ 37 (the interrogation should be carefully viewed within the context of the surrounding circumstances leading up to the defendant's response). The defendant often *continued speaking immediately* after making such statements, including asking questions himself of the detectives right after supposedly invoking his right to remain silent. Such behavior shows that he was *voluntarily* engaging in the discussion.

¶ 53    In sum, when the defendant's statements are reviewed in the entirety of their context within the exchange with the detectives, it is clearly a back and forth in which the defendant was himself attempting to gain information from the detectives regarding what they knew about the crime. At other points, he expressed frustration with the process, all while continuing to talk. This behavior did not indicate a desire to end all questioning and it certainly was not an unambiguous and unequivocal invocation of the right to remain silent throughout most of the ERI. See *id* (the invocation must be clear and specific).

¶ 54    We do find, however, that the defendant unequivocally invoked his right to remain silent toward the end of the ERI when he said, "I don't wanna talk no more, sir," and actually stopped talking at that point. That invocation was not scrupulously honored because the detectives continued talking to the defendant about the case and did not cease the interrogation. Consider the following statement made by one of the detectives after the defendant's invocation:

> "All right, we'll leave it at that. You could leave it in the hand - we'll do the lineups.
>
> You know I - I - I don't know what else I could tell you man. I mean I've been

honest with you, I've been straight forward. I'm not gonna keep playin' this game. I stood in here longer than I wanted to and I mean you're still bullshittin'. You don't wanna tell us who you were down there with."

Arguably, any statements the defendant made *after* that invocation of his right to remain silent were inadmissible. *People v. Flores*, 2014 IL App (1st) 121786, ¶ 58 (statements made after the invocation of the right to remain silent are admissible only if the interrogators scrupulously honored the defendant's right to cut off questioning).

¶ 55    Nonetheless, even if we were to find that the trial court erred in denying the defendant's motion to suppress his statement from that specific point of the interrogation, we conclude that the error was harmless. "In determining whether a constitutional error is harmless, the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *People v. Patterson,* 217 Ill. 2d 407, 428 (2005). To determine whether an error is harmless, a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction, (2) examine the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *Id.*

¶ 56    If the trial court had excluded the portions of the defendant's ERI from the point at which the defendant made his unequivocal invocation of his right to remain silent, it would be inconsequential because the rest of the information gathered during his ERI overwhelmingly supports conviction. Prior to invoking his right to remain silent, the defendant implicated himself as being part of the group that shot Mr. Thomas while seeking revenge against the rival gang for the beating of Marshawn. The defendant's statements made after his invocation of his right to

remain silent were duplicative of the information which he had already shared with the detectives. Also, Marshawn gave uncontroverted testimony that he went to the defendant's house after he was beaten by the rival gang and that the shooting occurred later that same night. This was additional evidence that supported the State's theory that the shooting occurred as a result of the defendant's gang attempting to avenge Marshawn's beating by the rival gang. Thus, even without the small portion of the defendant's ERI after his unequivocal invocation of his right to remain silent, the evidence against him was overwhelming. Accordingly, any error by the trial court in failing to suppress the specific portion of the defendant's statement after the unequivocal invocation of the right to remain silent, is harmless. See *People v. Hannah*, 2013 IL App (1st) 111660, ¶ 48 (despite the trial court's error in denying the defendant's motion to suppress, we find the error to be harmless where the defendant subsequently made a second incriminating statement). We therefore find the defendant's argument to be without merit.

¶ 57    The final argument made by the defendant is that his sentence of 65 years' imprisonment is excessive. He claims that, in sentencing him to a *de facto* life sentence, the trial court failed to take into consideration his young age at the time of the murder (20 years old) or his unstable childhood. In support of his argument, he cites to recent case law from this court which focuses on the brain development of emerging young adults and how that impacts sentencing.

¶ 58    A sentence within the appropriate sentencing range is generally accorded great deference by this court. *People v. Colon*, 2018 IL App (1st) 160120, ¶ 65. We will not alter a defendant's sentence absent an abuse of discretion. *Id.* "Our supreme court has found that, with respect to a sentence, an abuse of discretion occurs when the sentence is greatly at variance with the spirit or purpose of the law or manifestly disproportionate to the nature of the offense." *Id.*

¶ 59    The sentencing range in this case was 35 to 75 years, and so the defendant's 65-year sentence falls within that range and is therefore presumed to be proper. See *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. The defendant nevertheless argues that the trial court failed to consider some important mitigating factors, especially his youth and upbringing. Yet, the record shows that the trial court *did* carefully review the defendant's PSI and consider all the relevant mitigating factors. In fact, in imposing the defendant's sentence, the trial court explicitly stated that it considered all the mitigating factors. And the trial court was not required to articulate each and every factor that it considered but that does not mean that it did not take all the important and relevant factors into account. See *Jones*, 2019 IL App (1st) 170478, ¶ 54 (when mitigating factors have been presented to the trial court, it is presumed the court considered those factors, absent some indication to the contrary).

¶ 60    Further, the record shows that the defendant's sentence reflects the significant consideration of his violent behavior in jail while he was awaiting trial. And the trial court emphasized the seriousness of the crime, which is the most important factor. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 28. It therefore cannot be said that the trial court abused its discretion in sentencing the defendant and we affirm his sentence of 65 years' imprisonment.

¶ 61    We note that, while the defendant cites to recent cases where this court found *de facto* life sentences to be unconstitutional for young adult offenders pursuant to the Illinois Proportionate Penalties Clause, the defendant does not allege that his sentence is unconstitutional.

¶ 62                                    CONCLUSION

¶ 63    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 64    Affirmed.